**UNITED STATES of America,**
**Appellee,**

v.

**Edward GANDIA, Defendant–Appellant.**

**Docket No. 04–6477–CR.**

United States Court of Appeals,
Second Circuit.

Argued: July 14, 2005.

Decided: Sept. 19, 2005.

---

Neil B. Checkman, New York, NY, for Defendant–Appellant.

Sarah Y. Lai, Assistant United States Attorney for the Southern District of New York (David N. Kelley, United States Attorney, Peter G. Neiman, Assistant United States Attorney, of counsel), New York, NY, for Appellee.

Before: STRAUB and SACK, Circuit Judges, and KRAVITZ, District Judge.[*]

SACK, Circuit Judge.

The defendant-appellant, Edward Gandia, appeals from his conviction and sentence, following a bench trial in the United States District Court for the Southern District of New York (William H. Pauley, III, *Judge* ), on charges of being a felon in possession of a firearm and ammunition in violation of 18 U.S.C. § 922(g). Prior to trial, Gandia moved to suppress a firearm and ammunition that police officers had discovered as a result of a warrantless search of the living room and bedroom of his apartment. The government argued that because Gandia consented to the entry of the officers into his kitchen for the purpose of interviewing him, they were entitled to search other rooms of his apartment as part of a "protective sweep."

The district court agreed with the government. It denied Gandia's motion to suppress, holding 1) that under *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990), once properly inside a person's home, police officers are permitted to conduct protective sweeps even when they have not entered the home with an arrest warrant, and 2) that there was an objective basis for reasonable concern about risk to the officers' safety in Gandia's apartment that justified their limited, protective sweep in the course of which the evidence sought to be suppressed was found. Because we disagree with the district court's second conclusion and decide that this search was not supported by "specific and articulable facts that the area to be swept harbor[ed] an individual posing a danger" to the officers, *Buie*, 494 U.S. at 337, 110 S.Ct. 1093, we need not and do not resolve whether, even when accompanied by such specific and articulable facts, *Buie* permits police officers to conduct a protective sweep of a suspect's home without an arrest warrant. *See United States v. Moran Vargas*, 376 F.3d 112, 115 (2d Cir.2004) (concluding that, having decided the second issue, we need not address the first). Accordingly, we remand for further proceedings including reconsideration of whether to resentence Gandia under *United States v. Crosby*, 397 F.3d 103, 119 (2d Cir.2005).

## BACKGROUND

*The Search of Gandia's Apartment* [1]

On the evening of November 28, 2003, three New York City Police Department

---

[*] The Honorable Mark R. Kravitz, of the United States District Court for the District of Connecticut, sitting by designation.

1. The recitation of facts is based on the testimony of two police officers (Sergeant Morales and Officer Lawton) and the defendant at the suppression hearing. We have indicated where the testimony of the witnesses is inconsistent.

police officers—Sergeant Morales, Officer Lawton, and Officer Perez—received a radio report of a dispute between a building superintendent and a tenant at 381 East 151st Street in the Bronx. The report indicated that one of the parties might be wielding a gun and described him as a Hispanic male wearing a yellow jacket and gray pants. When the officers arrived at the building in question a minute or two later, they saw Gandia, who matched the description from the radio report. The building superintendent, Pablo Suarez, approached from an alleyway to speak with Sergeant Morales. Suarez told Morales that Gandia had accosted him (Suarez) and accused Suarez of telling the building landlord that Gandia was a "rat." According to Suarez, Gandia began to pull an object, which Suarez thought to be a gun, from his waist area. Suarez ran into his apartment, and Gandia tried to follow, banging on Suarez's front door and, according to Morales's later testimony, saying something to the effect of, "I don't care if you call the cops, I'm still going to get you anyway." Suppression Hr'g Tr., Apr. 28, 2004, ("Hr'g Tr.") at 7.

While Sergeant Morales spoke with Suarez, Officers Lawton and Perez approached Gandia and identified themselves as police officers. The officers frisked Gandia. He was unarmed. Without being asked, Gandia told the officers that he did not have a gun. Gandia explained that he had confronted Suarez because Suarez had been falsely telling residents that Gandia had a gun. Neither of the officers had their weapons drawn during this encounter. The tone of the conversation was calm.

After speaking with Suarez, Sergeant Morales told him to go back to his apartment. Morales then joined the other officers talking to Gandia. Suarez soon came back outside, however, and resumed his shouting match with Gandia.

Morales then asked Gandia if he lived in the building. Gandia replied that he did and, when asked, gave the officers his apartment number. One of the officers asked Gandia if they could go up to his apartment to discuss what had happened. Sergeant Morales and Officer Lawton later testified that they had done so because it was raining, because they wanted to separate Gandia and Suarez to avoid any further conflict, and because they had insufficient privacy while in front of the building to conduct an interview. Gandia agreed to take them to his apartment. None of the officers had his weapon out, Gandia was not handcuffed or otherwise constrained, and the tone of the conversation remained calm.

The three police officers escorted Gandia to his apartment. Before Gandia opened the door, Sergeant Morales asked Gandia if anyone else was there. Gandia replied that he lived alone. He opened the door and entered the apartment first, followed by the police officers. They did not ask him for permission to conduct a search. Morales later testified that he knew Gandia had given them permission to enter the apartment but had not given them permission to search it.

Gandia's front door opened directly into a small kitchen. A door to one side of the kitchen led into the bathroom, directly opposite the front door of the apartment. There was also a doorframe, without a door on the hinges, which led from the kitchen into the adjoining living room.

Sergeant Morales walked over to this open doorframe and positioned himself just outside the kitchen and inside the living room. The two other officers remained in the kitchen area, talking to Gandia. From where Morales stood, he could see the "whole apartment." Hr'g Tr. at

10. Morales later testified that he did this for "safety reasons" because, despite having been told otherwise by Gandia, he did not know whether there were other people in the apartment. *Id.* Morales testified that he did not "trust anyone" because "[a]nybody can tell me anything." *Id.* at 11. Although Morales testified that he did not try to hide his movements while walking over to the living room, Gandia testified that he did not see Morales because he was preoccupied with talking with the two other police officers.

The conversation between Gandia and the police officers lasted for about a minute to a minute-and-a-half. The atmosphere remained calm. Gandia was not physically restrained or instructed to remain in the kitchen. He nonetheless remained standing there.

During the conversation, Sergeant Morales did not see anyone in the living room or hear any sounds indicating that someone else was present in the apartment. As he was "looking all over the apartment" from his position near the doorframe, however, Morales noticed something that "appear[ed] to [him] to be a bullet," standing upright on top of a home entertainment center, about eighteen to twenty-three feet from where he was standing. *Id.* at 12–13. Morales took a few steps further into the living room and asked Gandia, who was still in the kitchen, whether the object was, in fact, a bullet. Gandia said that it was a "fake." *Id.* at 12. Morales later testified that this exchange was calm, but Lawton testified that Gandia was upset when he answered Morales's question.

Morales picked up the bullet, saw that it was marked .45 caliber, and told Gandia, "[I]t looks real to me." *Id.* at 14. At that point, Morales took a "quick peek" into the bedroom—which was connected to the living room, toward the back, by another doorless frame—as a "safety measure[ ]," to see if someone else was in there. *Id.* at 14–15. He saw no one, but did see, hanging on the bedroom wall, a chart containing illustrations of different types of bullets. Morales did not open any furniture drawers, and did not look in any other enclosures or under the furniture, in either in the living room or the bedroom.

Officer Lawton gave a somewhat different account of how the bullet was discovered. Lawton testified that after talking with Gandia in the kitchen for about a minute, and after Sergeant Morales had already entered the living room, Lawton also went into the living room to make sure no one was there. He said that he saw Morales standing on the other side of the room, near the wall. Lawton then noticed the bullet standing upright on top of the entertainment center. He testified that after seeing the bullet, he went into the bedroom to make sure no one else was there. He then saw the bullet chart on Gandia's bedroom wall. Lawton did not open any drawers or doors, and did not look under the furniture or in the living room or bedroom. Lawton then returned to the kitchen, where Gandia was still standing with Officer Perez.

Lawton testified that he briefly looked behind the sink next to Gandia to make sure that there were no firearms within his reach. Lawton then went back to the living room, picked up the bullet, and showed it to Morales, who asked Gandia about it. Lawton then left Gandia's apartment and spoke again with Suarez, who told Lawton that Gandia had displayed a weapon.

After Sergeant Morales and Officer Lawton had both seen the bullet and looked into Gandia's bedroom, Morales asked Gandia whether he would consent to a search of the apartment. Gandia refused. Gandia testified that he told Morales: "What are you doing? You don't

even have a search warrant. What are you searching my apartment for?" *Id.* at 88. The parties dispute whether Gandia then asked the officers to leave. All parties agree that until then, Gandia had not asked the officers to leave, but neither had he given them explicit permission to look into the living room or bedroom.

According to Sergeant Morales, after Gandia refused to permit a search of his apartment, Morales told the other officers to leave and indicated that they should apply for a search warrant.[2] One of the officers told Gandia that he was going to be placed under arrest. The officers then took Gandia into the building hallway, and, after he had closed the door of his apartment, the officers placed Gandia under arrest, handcuffing him. About five minutes elapsed between the time that the officers entered Gandia's apartment and the time that they left with Gandia. Based on the information the officers had obtained during their presence in Gandia's apartment, they obtained a warrant to search the premises. Upon executing the warrant, they found a gun and additional ammunition in Gandia's apartment. Gandia was charged with one count of being a felon in possession of a firearm and ammunition, in violation of 18 U.S.C. § 922(g)(1).

*Proceedings in the District Court*

Gandia moved to suppress the physical evidence and his statement that the bullet was a "fake," arguing that although the gun and ammunition were discovered pursuant to a search warrant, the warrant itself was based on information obtained from an initial unconstitutional search. In a Memorandum and Order dated June 18, 2004, the district court denied Gandia's motion to suppress. The court upheld the search as a justified "protective sweep" of the apartment. It therefore did not ad-dress the government's alternative arguments that Gandia had given the officers implied consent to enter the living room and that the police would have inevitability discovered the evidence.

The district court first declared that it was "undisputed that the officers were lawfully within Gandia's apartment because they entered the premises on Gandia's consent." *United States v. Gandia,* No. S1 03 Cr. 1503, 2004 WL 1396164, at *3, 2004 U.S. Dist. LEXIS 11032, at *8 (S.D.N.Y. June 18, 2004). The court therefore concluded that "the only issue is whether the officers were entitled to conduct a protective sweep, even though they did not intend to arrest Gandia at the time they entered his apartment." *Id.* The court noted that under the Supreme Court's decision in *Maryland v. Buie,* "officers entering a house with an arrest warrant can conduct a protective sweep of the premises if they possess 'a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene.'" *Id.,* at *3, 2004 U.S. Dist. LEXIS 11032, at *8–9 (quoting *Buie,* 494 U.S. at 334, 110 S.Ct. 1093). It rejected Gandia's argument that such protective sweeps are only permissible when incident to an arrest. Drawing on *Buie*'s reasoning, and citing cases from other circuits, the court instead found that "limited, pre-arrest protective sweeps of a home for officer safety are lawful where there are specific articulable facts supporting a reasonable suspicion of risk to the officers' safety." *Id.,* at *3, 2004 U.S. Dist. LEXIS 11032, at *9.

The district court decided that the protective sweep of Gandia's apartment was justified by specific and articulable facts because: 1) the police officers knew that Gandia had recently been involved in a

---

**2.** As they were leaving, Morales also saw some gun magazines in Gandia's kitchen.

heated altercation and was still upset; 2) the radio report to which the officers responded indicated that the dispute involved a firearm, and the officers had been informed that Gandia had a gun; 3) the fact that Gandia stated he did not have a gun before he was questioned about it, and that no gun was found on his person when he was frisked, raised the possibility of a missing firearm; and 4) Suarez reported that he had felt threatened enough to call the police Therefore, the court concluded, "[t]he danger to the officers in this situation [was] no less than if the officers had been there pursuant to an arrest warrant." *Id.*, at *4, 2004 U.S. Dist. LEXIS 11032, at *13.

Because the district court concluded that the protective sweep was justified and that the officers found the bullet and poster in "plain view" during the course of their protective sweep, the court held that the search warrant application was not based on a search that violated Gandia's constitutional rights and that the gun, ammunition, and Gandia's statement were therefore admissible.

After his motion to suppress was denied, Gandia was convicted following a bench trial held on stipulated facts. At sentencing, the district court rejected Gandia's motion for a downward departure based on his HIV status and other medical conditions and sentenced him to eighty-four months' imprisonment, which was the midpoint of his sentencing range under the United States Sentencing Guidelines.

## DISCUSSION

### I. Standard of Review

■ We review *de novo* the district court's legal conclusions and accept its factual determinations, unless clearly erroneous, viewing those facts in the light most favorable to the government. *United*

*States v. Casado,* 303 F.3d 440, 443 (2d Cir.2002). In the specific context of a "protective sweep" by law enforcement officers, we review *de novo* a district court's determination as a matter of law that the officers had a "reasonable suspicion" that a third person posing a danger to them might be present on the property. *United States v. Moran Vargas,* 376 F.3d 112, 114 (2d Cir.2004).

### II. "Protective Sweeps"

A *Buie* "protective sweep" is "a quick and limited search of premises" that "is narrowly confined to a cursory visual inspection of those places in which a person might be hiding." *Buie,* 494 U.S. at 327, 110 S.Ct. 1093. Unlike most warrantless searches, which focus on the immediate danger posed by a suspect, a *Buie* protective sweep allows officers to stop a potential ambush by searching for unseen third parties. This distinction separates *Buie* from the warrantless searches the Supreme Court sanctioned in *Chimel v. California,* 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), and *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983).

Under *Chimel,* police may conduct "a search of the arrestee's person and the area 'within his immediate control'—construing that phrase to mean the area from within which he might gain possession of a weapon or destructible evidence," *Chimel,* 395 U.S. at 763, 89 S.Ct. 2034, i.e., the "grab area." "[T]he justification for the search incident to arrest considered in *Chimel* [was] the threat posed by the arrestee ...." *Buie,* 494 U.S. at 336, 110 S.Ct. 1093. We have occasionally referred to the search of an arrestee's immediate "grab area" under *Chimel* as a "protective sweep." *See, e.g., United States v. Her-*

*nandez*, 941 F.2d 133, 137 (2d Cir.1991). But as used by the *Buie* court, a "protective sweep" seems clearly to refer to a search that focuses not on "the threat posed by the arrestee, [but] the safety threat posed by the house, or more properly by unseen third parties in the house." *Buie*, 494 U.S. at 336, 110 S.Ct. 1093.

This distinction similarly separates a *Buie* "protective sweep" from the other types of searches that law enforcement officials may conduct consistent with Fourth Amendment protections despite the fact that they are made without a warrant or probable cause. *Terry* and *Long* authorize warrantless searches on less than probable cause in order for police "to assure themselves that the persons with whom they [are] dealing [are] not armed with, or able to gain immediate control of, a weapon." *Id.* at 333, 110 S.Ct. 1093. A *Buie* protective sweep addresses instead the "interest of the officers in taking steps to assure themselves that the house in which a suspect is being, or has just been, arrested is not harboring other persons who are dangerous and who could unexpectedly launch an attack." *Id.*

*Buie* authorizes a "protective sweep," defined as "a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others," in the context of a physical entry to execute an arrest warrant. *Id.* at 327, 110 S.Ct. 1093. A majority of our sister circuits that have considered the issue have expanded *Buie* to authorize protective sweeps even when officers have not entered a suspect's home pursuant to an arrest warrant. *See, e.g., United States v. Martins*, 413 F.3d 139, 149–51 (1st Cir. 2005); *Leaf v. Shelnutt*, 400 F.3d 1070, 1086–88 (7th Cir.2005); *United States v. Gould*, 364 F.3d 578, 581–87 (5th Cir.) (en banc), *cert. denied,* —— U.S. ——, 125 S.Ct. 437, 160 L.Ed.2d 317 (2004); *United*

*States v. Taylor*, 248 F.3d 506, 513–14 (6th Cir.), *cert. denied,* 534 U.S. 981, 122 S.Ct. 414, 151 L.Ed.2d 315 (2001); *United States v. Patrick*, 959 F.2d 991, 996–97 (D.C.Cir. 1992). These courts have generally reasoned that because "[t]he underlying rationale for the protective sweep doctrine is the principle that police officers should be able to ensure their safety when they lawfully enter a private dwelling," there is no reason to distinguish between situations in which police enter pursuant to a warrant and those in which police are present through other lawful means. *Leaf*, 400 F.3d at 1087.

But there is something less than a consensus. *See United States v. Davis*, 290 F.3d 1239, 1242 n. 4 (10th Cir.2002) (rejecting argument that warrantless entrance justified a protective sweep and emphasizing that a protective sweep "'is a quick and limited search of premises, *incident to an arrest* and conducted to protect the safety of police officers or others.'" (quoting *Buie*) (emphasis in *Davis*)); *United States v. Reid*, 226 F.3d 1020, 1027 (9th Cir.2000) (holding that a protective sweep was improper, in part because at the time of the search, the defendant, "was *not* under arrest" (emphasis in original)).

Although we do not decide this issue, we do note that when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing *Buie* will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home. As the Fifth Circuit, sitting en banc, recently recognized:

> [P]rotective sweeps following a consent entry may in certain circumstance pose Fourth Amendment concerns not present in cases where the initial entry is pursuant to a warrant. For example, concerns might arise respecting a consent to entry requested for a stated

common purpose but actually intended not for that purpose but rather for the purpose of gaining access in order to then make a protective sweep of the entire home for unrelated reasons and thus circumvent the warrant requirement.

*Gould,* 364 F.3d at 589. This sort of pretext may be less likely when police enter a home with a search warrant, *see United States v. Daoust,* 916 F.2d 757, 759 (1st Cir.1990), upon probable cause combined with exigent circumstances, *see Martins,* 413 F.3d at 149–50, or pursuant to the "danger exception" to the normal requirement that officers knock and announce themselves, *see Leaf,* 400 F.3d at 1084–85. In the first circumstance, a warrant would, in any event, have been obtained through judicial process; and in the latter two circumstances, the presence of emergent conditions in effect assures that the officers have a non-pretextual reason for entering the premises.

▆▆▆▆ In the instant case—unlike when officers enter a suspect's home in order to execute an arrest warrant or under exigent circumstances—there was no need for the police officers to enter Gandia's home in the first place. They were there for their own convenience (and perhaps for his) while taking his statement. Indeed, the entrance or hallway of the building, or their own police vehicle, would have fulfilled their stated purposes: getting out of the rain, separating Gandia and the building superintendent from each other, and obtaining a measure of privacy. The officers could have avoided "the disadvantage of being on his adversary's 'turf,'" *Buie,* 494 U.S. at 333, 110 S.Ct. 1093, by simply

interviewing Gandia elsewhere. There was also nothing preventing the officers from making explicit any concern they may have had about the presence of others in Gandia's apartment and seeking his express permission for a search of other rooms. "A protective sweep is without question a 'search' ... [and] they are permissible on less than probable cause only because they are limited to that which is necessary to protect the safety of officers and others." *Buie,* 494 U.S. at 335 n. 3, 110 S.Ct. 1093.

We confronted a similar problem in *United States v. Moran Vargas,* 376 F.3d 112, 115 (2d Cir.2004). There, the police gained access to a suspect's hotel room through his consent. They then searched his bathroom without his consent using a "protective sweep" rationale. We declined to decide whether *Buie* extends to warrantless searches [3] because we concluded that the particular search in *Moran Vargas* was not supported by articulable facts that would cause a reasonable officer to believe the area might harbor other people who might pose a danger to the officers. *Moran Vargas,* 376 F.3d at 116. We again find it unnecessary to decide whether *Buie* authorized a protective sweep of Gandia's apartment despite the fact that the police officers lacked an arrest warrant. The search of the apartment was unconstitutional, even under such an extension of *Buie,* because the police lacked specific, articulable facts to justify their warrantless search.

▆▆▆ The *Buie* Court explicitly declined to hold that the danger inherent in executing an arrest warrant will *ipso facto* justify a protective sweep: "The type of search

---

**3.** As in this case, we did not have occasion in *Moran Vargas* to address situations in which there is probable cause combined with exigent circumstances or an assertion of a "danger exception" to knock-and-announce rules.

The government conceded that it lacked a search warrant and that there were no exigent circumstances present. *See Moran Vargas,* 376 F.3d at 114.

we authorize today ... is decidedly not 'automatic,' but may be conducted only when justified by a reasonable, articulable suspicion that the house is harboring a person posing a danger to those on the arrest scene." *Buie,* 494 U.S. at 336, 110 S.Ct. 1093 (quoting *Chimel,* 395 U.S. at 767 n. 12, 89 S.Ct. 2034 (alteration omitted)). Officers must point to facts that give rise to an individualized suspicion and cannot rely solely on generalizations that suspects are usually accompanied by dangerous third parties. *See Moran Vargas,* 376 F.3d at 116.

As we have noted, in finding "articulable facts" to justify the protective sweep of Gandia's apartment, the district court pointed to: 1) the officers' knowledge that Gandia had recently emerged from a heated argument; 2) the police radio call which informed them that Gandia might have a gun; 3) the fact that Gandia stated he did not have a gun prior to being questioned about it; and 4) the fact that the officers had not recovered the gun during their pat-down frisk of him. Even if these facts support a reasonable inference that Gandia was hiding a gun in the apartment, we do not see how they support the inference that there was a person hiding in the apartment who might use it. Any concern that Gandia himself might be dangerous was fully and permissibly addressed by the officers by frisking Gandia, and by a search within his "grab area," i.e., by looking behind the sink next to which Gandia was standing to assure that there were no firearms within Gandia's reach. The search of an adjoining room to which Gandia had no ready access was unnecessary for this purpose. *Compare United States v. Hernandez,* 941 F.2d 133, 137 (2d Cir. 1991) (upholding protective search of the suspect's "grab area") *with United States v. Blue,* 78 F.3d 56, 60 (2d Cir.1996) (holding unconstitutional a search that "extended beyond the area from within which [suspects] might have gained possession of a weapon").

The government, moreover, has pointed to nothing in the record from which a reasonable police officer could have inferred that there was a specific danger of unknown third-parties hiding in Gandia's apartment. Even if we agreed with the government's argument that where "there is strong reason for the officers to fear that there is an unaccounted-for gun on the scene, the circumstances suggesting that another person may be present on the scene need only be modest," Appellee's Br. at 26, the government in this case has not made even a "modest" showing. Of course, the police officers were not required to take Gandia at his word when he told them that he lived alone, nor to infer that there was no one else in the apartment when they entered. But they also had no evidence to the contrary that would indicate a third person might be hiding there. " 'Lack of information cannot provide an articulable basis upon which to justify a protective sweep.' " *Moran Vargas,* 376 F.3d at 117 (quoting *United States v. Colbert,* 76 F.3d 773, 778 (6th Cir.1996)). *Compare Taylor,* 248 F.3d at 514 ("Before they were admitted into the apartment, [officers] heard scuffling noises from inside that indicated that there might be more than one person in the apartment."), *with Moran Vargas,* 376 F.3d at 116 ("[N]one of the agents testified to hearing any noises coming from the bathroom or to seeing any evidence that might have indicated that another person was present.").

III. Consent

The government argues, in the alternative, that we should affirm the judgment of the district court by concluding that Gandia consented to the officers' en-

tering his living room. We "can affirm the district court's order upon any ground that the record demonstrates without limitation to the grounds on which the district court relied." *United States v. Dhinsa*, 171 F.3d 721, 727 (2d Cir.1998).

 "The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?" *Florida v. Jimeno*, 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991). The scope of the suspect's consent is a question of fact, and "[t]he government has the burden of proving, by a preponderance of the evidence, that a consent to search was voluntary." *United States v. Isiofia*, 370 F.3d 226, 230–31 (2d Cir.2004).

It is clear from the testimony of both the police officers and Gandia that the officers never explicitly asked for permission to search Gandia's apartment and that Gandia did not explicitly grant such permission. The government argues, however, that by not objecting to Morales moving into the living room, Gandia impliedly consented for the police to go there. Gandia, however, testified that he did not notice that Morales or Lawton had gone into the living room until he heard Morales yelling that he had found a bullet, at which point Gandia promptly objected to the search.

The district court did not reach the issue of consent to a search in ruling on Gandia's motion to suppress. And the record in its present state is not sufficient to permit us to consider and decide the issue in the first instance. We therefore remand for the district court to, *inter alia*, make additional factual findings and conclude whether Gandia consented to the police officers' entering other rooms of his apartment.

*Cf. Moran Vargas*, 376 F.3d at 113–14 (finding lack of consent when "Moran quickly shut the bathroom door, telling the agents that they could not use his bathroom").

### III. *Crosby* Remand

The district court sentenced Gandia before *United States v. Booker*, —— U.S. ——, 125 S.Ct. 738, 160 L.Ed.2d 621 (2005), was decided, under the then-mandatory United States Sentencing Guidelines. If on remand the district court again denies Gandia's motion to suppress, the court should determine "whether to resentence, now fully informed of the new sentencing regime." *United States v. Crosby*, 397 F.3d 103, 117 (2d Cir.2005) (emphasis deleted).

### CONCLUSION

For the foregoing reasons, the case is remanded to the district court with instructions for it to decide the issue of consent. If the court decides in Gandia's favor on that issue, it shall vacate its order and judgment of conviction and offer Gandia a new trial (should the government seek to pursue one) with the evidence suppressed. If the court decides the issue in the government's favor and reconfirms the validity of the conviction, it shall decide whether to re-sentence Gandia under *Crosby*.