No. 09-5193-cr
*USA v. Hassock (USA)*

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

August Term 2010

(Argued: October 5, 2010                    Decided: January 28, 2011)

Docket No. 09-5193-cr

UNITED STATES OF AMERICA,

        *Appellant,*

– v. –

ERIC HASSOCK,

        *Defendant-Appellee.*

Before:      MINER, B.D. PARKER, AND RAGGI, *Circuit Judges.*

Appeal from an Order entered November 20, 2009, in the United States District Court for the Southern District of New York (Jones, *J.*), after a hearing, suppressing as the product of an unreasonable search, a firearm discovered during a purported protective sweep of the defendant-appellee's bedroom, the government having certified that the suppressed firearm is substantial proof of a fact material to the prosecution of an indictment charging defendant-appellee with being a felon in possession of a firearm.

Affirmed.

JENNIFER E. BURNS, Michael A. Levy, Assistant United States Attorneys (*for* Preet Bharara, United States Attorney for the Southern District of New York), New York, New York, for Appellant.

STANISLAO A. GERMÁN, Law Office of Stanislo A. Germán, New York, New York, for Defendant-Appellee.

-1-

MINER, *Circuit Judge*:

The government appeals from an Order entered November 20, 2009, in the United States District Court for the Southern District of New York (Jones, J.), suppressing as evidence a handgun allegedly belonging to defendant-appellee Eric Hassock, a/k/a David St. Walton, a/k/a Basil LNU ("Hassock"). The government proposed to enter the firearm into evidence as proof of a fact material in the prosecution of Hassock for being a felon in possession of a firearm. The District Court determined, after a hearing, that the firearm was secured as the result of an unreasonable search of Hassock's bedroom. The government contends on appeal, as it did below, that the handgun in question was discovered in the course of a proper protective sweep. We affirm for the reasons set forth below.

## BACKGROUND

### I. Investigation

In reciting the background for our analysis in this case, we rely essentially on the factual findings made by the District Court.

The investigation that led to Hassock's indictment for being a felon in possession of a firearm began with information received from a confidential source. The information was supplied to Senior Special Agent Christopher Quinn ("Agent Quinn" or "Quinn") of the Department of Homeland Security, Immigration and Customs Enforcement ("ICE") in November 2008. Agent Quinn identified the confidential source as "CS-1" in a complaint filed on January 22, 2009, in support of an arrest warrant for Hassock. In the complaint, Agent Quinn stated

> that CS-1 saw BASIL LNU, a/k/a "David St. Walton," the defendant, with a
> black semiautomatic handgun in BASIL LNU's home, which is located in
> the basement apartment at 3201 Mickle Avenue in the Bronx, New York.
> CS-1 identified the building to me and other law enforcement agents and

described the layout of the basement apartment. CS-1 further stated that BASIL LNU is a marijuana dealer. CS-1 also provided me with a picture of BASIL LNU. CS-1 further stated that CS-1 believes BASIL LNU is an illegal alien and is from Jamaica.

The investigation was pursued by an inter-agency task force (the "Task Force") that included Agent Quinn and law enforcement personnel detailed from the Drug Enforcement Administration, the Federal Bureau of Investigation, the New York Police Department, the New York State Police, and the Internal Revenue Service. In the course of the investigation, the Task Force acquired information that "Basil" occupied the front bedroom in the basement apartment in which he resided; that he stayed out late, slept late, usually departed from his apartment around noon, and had no known legal employment. Moreover, the photograph and physical description provided to Quinn by the confidential informant showed Basil to be an African-American male approximately six feet tall and weighing approximately 220 pounds.

In order to obtain the true identity of "Basil," which was then unknown, the Task Force conducted residence checks and record checks. These efforts were unsuccessful, and the Task Force resolved to speak with the subject of their investigation at his home. Accordingly, on November 25, 2008, Agent Quinn and four other Task Force members headed to the basement apartment at 3201 Mickle Avenue. The purpose of the visit, according to Quinn, was to conduct surveillance and to "knock and talk," that is to "knock on the door and interview potential residents to see if the information that we have is accurate, to see if there is any further follow-up investigation we can do." Tr. at 15. More specifically, Agent Quinn described the "initial reason" for the visit as an opportunity to talk to "Basil" and "another reason" as "to potentially arrest him." Id.

II. Surveillance and Entry

When Agent Quinn and the other members of the Task Force arrived at 3201

-3-

Mickle Avenue on November 25 at approximately 8:00 a.m., they took up surveillance from their vehicle outside the building. After about an hour, during which no one was seen entering or leaving the basement apartment, the Task Force made the decision to pursue their investigation by simultaneously knocking on the front and rear doors of the apartment. On cross-examination at the suppression hearing, Quinn agreed that "[t]he purpose of knocking on the door[s] was to have this conversation with a person whom [he] believed was known as Basil." Id. at 18.

Agent Quinn and two other members of the Task Force knocked on the front door, and two members knocked on the rear door after entering the fenced-in area of the yard. Those at the front door received no response after knocking for about a minute, but Quinn then received word by radio from those at the rear that the door there was being opened. Quinn then walked to the rear of the building and there found a woman inside the apartment speaking to members of the Task Force.

At that point, according to Quinn, "[t]here was a brief exchange about who's here. The young lady said, essentially, I don't know, you guys woke me up. Is anyone else in the apartment, words back and forth like that. Can we look around? And she said yes." Id. at 6. Quinn did not recall whether he overheard this conversation or whether it was repeated to him by another member of the Task Force. In any event, Quinn himself had no conversation with the woman who opened the door, nor did he or any other Task Force member ascertain her identity or question her further before proceeding into the interior of the apartment.

III.    "Sweep," Discovery, and Seizure

In what the government described as a protective sweep, Quinn and another member of the Task Force, Detective John Salvetti ("Detective Salvetti"), passed through

the apartment directly to the front where a bedroom was located. Quinn believed that this bedroom was occupied by "Basil," whose true identify still was unknown to him. In approaching the bedroom, Quinn had his gun drawn (or had his hand on his gun), being concerned that Basil "could come out with a firearm or a gun or pose a danger." Id. at 24. The bedroom, measuring approximately ten feet by ten feet, was one of two bedrooms in what Quinn described as a "pretty small" apartment, which included a living room, kitchen, and a common or storage area. Id. at 22.

The front bedroom was taken up for the most part by a queen-sized bed on a frame. Once inside the bedroom, Detective Salvetti walked around the bed, and Quinn squatted down to look under the bed. Underneath the bed, and six to eight inches from the edge of the bed, Quinn discovered a Hi-Point .380 caliber pistol with a defaced serial number. It is this pistol that forms the basis of the firearm count with which Hassock was charged. Members of the Task Force also looked around the common area and underneath and behind a sofa. They remained in the apartment for a couple of hours. During that time, they spoke in some depth with the woman who had answered the door. They then learned that her name was Shareel Coley, that she was employed at Nordstrom in White Plains, that she occupied the back bedroom with her boyfriend, that the front apartment was occupied by "Bas" or "Basil" whose full name was unknown to her, and that she had been staying in the apartment for approximately one month. Apparently, the officers later learned from other sources that the person known as "Basil" is Eric Hassock and is also known as David St. Walton.

IV.    Proceedings in the District Court

An indictment filed on March 13, 2009, in the Southern District of New York charged that Hassock,

being an alien, unlawfully, willfully, and knowingly, did enter and was found in the United States, after having been deported from the United States on or about September 1, 2004, subsequent to a conviction for the commission of a felony, to wit, a conviction on or about April 6, 2000, in New York State County Court, Nassau County, for Criminal Possession of Marijuana in the Second Degree, in violation of New York Penal Law 221.25, without having obtained the express consent of the Attorney General of the United States or his successor, the Secretary for the Department of Homeland Security, to reapply for admission.

(Title 8, United States Code, Sections 1326(a) & (b)(1).)

The indictment also charged that Hassock

unlawfully, willfully, and knowingly, after having been convicted in a court of a crime punishable by imprisonment exceeding one year, to wit, a conviction on or about April 6, 2000, in New York State County Court, Nassau County, for Criminal Possession of Marijuana in the Second Degree, in violation of New York Penal Law 221.25, did possess in and affecting commerce, a loaded firearm, to wit, a .380 caliber Highpoint Semiautomatic handgun, with a defaced serial number, which previously had been shipped and transported in interstate and foreign commerce.

(Title 18, United States Code, Section 922(g)(1).)

By motion filed on June 9, 2009, Hassock sought to suppress from the evidence to be introduced at trial the firearm seized from his bedroom, contending it was discovered as the result of an illegal search. In support of his motion, Hassock filed his own affidavit, an affirmation by his attorney, and a memorandum of law. On June 18, 2009, the government filed a memorandum of law in opposition to the motion, contending that the firearm was seized during a lawful protective sweep. The District Court scheduled a hearing on the motion for June 26, 2009. The hearing was conducted on that date, and Agent Quinn was the only witness to testify. The court also heard the oral arguments of counsel, reserved decision at the conclusion of the hearing, and issued its Opinion and Order granting the motion on November 20, 2009.

In finding that the search of Hassock's bedroom was unreasonable, the court carefully considered the government's contention that the entry into Hassock's bedroom

was justified by the protective sweep doctrine first described by the Supreme Court in Maryland v. Buie, 494 U.S. 325 (1990). There, as the District Court correctly summarized, "the Supreme Court applied the Fourth Amendment reasonableness test and permitted a limited warrantless search, or protective sweep, in a home by officers who were executing an arrest warrant inside the home and who had a reasonable suspicion that an individual posing a threat to the officers was present elsewhere on the premises." United States v. Hassock, 676 F. Supp. 2d 154, 158 (S.D.N.Y. 2009). The District Court also correctly observed that we had extended Buie beyond the arrest warrant context to situations where officers enter a home under lawful process such as an order of protection. Id. at 159–60 (discussing United States v. Miller, 430 F.3d 93 (2d Cir. 2005)).

In the case at bar, the District Court determined "that the search was supported by a reasonable suspicion of danger and it did not exceed the scope of a protective sweep, [and that] the Court must decide whether the protective sweep doctrine applies in this context." Id. at 159. In concluding that the protective sweep doctrine did not apply "in this context," and granting suppression of the seized handgun, the court opined as follows:

> In all, a protective sweep may be reasonable, and therefore constitutional, where officers enter a suspect's home in order to execute a warrant, to enforce an order of protection, or pursuant to exigent circumstances. And there may be circumstances where police enter by consent and truly emergent conditions then arise. Here, however, by making a voluntary decision to enter the Apartment at approximately 9:00 AM on November 25, 2008, the task force put themselves at risk of the very danger that necessitated the protective sweep. And nothing the officers learned upon entering — i.e. that the Defendant might be there — was new to them. Accordingly, the Court finds that the search of Defendant's bedroom was unreasonable under the Fourth Amendment. . . .

Id. at 161–62.

The government filed a timely Notice of Appeal of the District Court's Order granting the motion to suppress and a certification, pursuant to 18 U.S.C. § 3731, that the appeal "is not taken for purpose of delay, and that the evidence suppressed pursuant to the November 20 Order is a substantial proof of a fact material in the proceeding."

**ANALYSIS**

I.      Evolution of the Protective Sweep Doctrine

The Fourth Amendment protects "[t]he right of the people to be secure in their person, houses, papers and effects against unreasonable searches and seizures." U.S. Const. amend IV. Because "the physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed," Payton v. New York, 445 U.S. 573, 585 (1980) (internal quotation marks omitted), "[i]t is a basic principle of Fourth Amendment law that searches inside a home without a warrant are presumptively unreasonable," Brigham City, Utah v. Stuart, 547 U.S. 398, 403 (2006) (internal quotation marks omitted). The Supreme Court found the presumption to be rebutted in the case of searches that fall under the definition of "protective sweep": "A 'protective sweep' is a quick and limited search of premises, incident to an arrest and conducted to protect the safety of police officers or others. It is narrowly confined to a cursory visual inspection of those places in which a person may be hiding." Buie, 494 U.S. at 327.

Buie had its genesis in the armed robbery of a restaurant by two men, one of whom was wearing a red running suit. Investigation apparently led to Buie and an accomplice, and police secured arrest warrants for both. After conducting surveillance of Buie's house and learning that he was inside, police officers entered and dispersed throughout the first and second floors. One officer shouted into the basement, identifying himself as the police and asking anyone present to come out. Buie eventually emerged and was

-8-

taken into custody. Thereafter, another officer entered the basement where Buie had been to search for anyone else who might be there. Although no one else was found to be present, the officer did discover a red running suit in plain sight atop a pile of clothes. It was this suit that Buie sought to suppress at the trial, where he ultimately was convicted by a state court jury for robbery with a deadly weapon and using a handgun in the commission of a robbery. Id. at 328.

In articulating the protective sweep doctrine, the Supreme Court found "most instructive" its holding in Terry v. Ohio, 392 U.S. 1 (1968), authorizing in a street encounter with police "a limited patdown for weapons where a reasonably prudent officer would be warranted in the belief, based on specific and articulable facts, and not on a mere inchoate and unparticularized suspicion or hunch, that he is dealing with an armed and dangerous individual." Buie, 494 U.S. at 331–32 (internal quotations and citations omitted). The Court noted that "[i]n Michigan v. Long, 463 U.S. 1032 (1983), the principles of Terry were applied in the context of a roadside encounter." Buie, 494 U.S. at 332. In Long, the Court approved the search of areas of the passenger compartment of an automobile where a weapon might be discovered, provided that facts and inferences available to a searching officer reasonably warranted the officer's belief that a suspect was dangerous and might gain control of the weapon. See Long, 463 U.S. at 1049–50. The Buie Court noted that "[i]n a sense, Long authorized a 'frisk' of an automobile for weapons." Buie, 494 U.S. at 332. In a similar sense, Buie authorized a "frisk" of areas in a house for a dangerous individual who might be hiding there.

The Supreme Court in Buie formulated the issue before it as "what level of justification is required by the Fourth and Fourteenth Amendments before police officers, while effecting the arrest of a suspect in his home pursuant to an arrest warrant, may

conduct a warrantless protective sweep of all or part of the premises." Id. at 327 (emphasis supplied). The Court resolved the issue as follows: "The Fourth Amendment permits a properly limited protective sweep in conjunction with an in-home arrest when the searching officer possesses a reasonable belief based on specific and articulable facts that the area to be swept harbors an individual posing a danger to those on the arrest scene." Id. at 337 (emphasis supplied). The Supreme Court thus has had occasion to apply the protective sweep doctrine only in the context of an in-house arrest pursuant to an arrest warrant.

We have interpreted the Buie decision to allow a protective sweep of a house where entry was made by police pursuant to "lawful process." See United States v. Miller, 430 F.3d 93, 95 (2d Cir. 2005). In Miller, police officers accompanied a man who had secured an order of protection into an apartment he had shared with the subject of the order, who had threatened to "'put a bullet through his head.'" Id. at 96. Entry was made pursuant to the terms of the order, which permitted the removal of personal belongings in the apartment. When the subject of the order sought to enter a bedroom, an officer gave him permission to do so but followed him into the bedroom "'[f]or safety.'" Id. (alteration in original). There the officer observed a shotgun standing upright in an open closet. The shotgun in Miller, like the handgun in this case, gave rise to a charge of possession of a firearm after a previous conviction for a felony. Id.

In arriving at our conclusion in Miller, we observed that "[a]t the core of Terry, Long and Buie is the common understanding that the Fourth Amendment's reasonableness requirement is sufficiently flexible to allow officers who have an objectively credible fear of danger to take basic precautions to protect themselves." Id. at 98. Accordingly, we proceeded to

-10-

hold that a law enforcement officer present in a home under lawful process, such as an order permitting or directing the officer to enter for the purpose of protecting a third party, may conduct a protective sweep when the officer possesses articulable facts which taken together with the rationale inferences from those facts would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the scene.

Id. (internal quotation marks and alteration omitted). We found justification for the officer's concern for his safety in the order of protection itself, in the officer's knowledge that an emotional domestic dispute was involved and, of course, in the threat by the subject of the order that he would shoot his former roommate in the head. Id. at 101.

Where officers cannot supply specific and articulable facts warranting a reasonably prudent officer to believe that an individual posing a danger is lurking in an area to be swept, we have found lacking an essential element necessary to justify a search under the protective sweep doctrine as defined in Buie. See United States v. Vargas, 376 F.3d 112, 117 (2d Cir. 2004). In Vargas, the defendant allowed two investigating agents into his hotel room and permitted them to look around the room. The agents apparently found nothing in the room and proceeded to interview the defendant. Noticing the bathroom door ajar, one of the agents headed to the bathroom and was told by the defendant that he could not enter. The agents called in a third agent, and one of the three entered the bathroom and found heroin there. Id. at 113. In rejecting the contention that the search of the bathroom was a protective sweep, we "conclude[d] that the agents' testimony did not provide sufficient articuable facts that would warrant a reasonably prudent officer to believe that an individual posing a danger to the agents was hiding in the bathroom of [defendant's] motel room." Id. at 116.

A similar lack of specific facts as to the presence of a lurking danger foreclosed application of the protective sweep doctrine in United States v. Gandia, 424 F.3d 255,

-11-

264 (2d Cir. 2005). Responding to a confrontation between the defendant and the superintendent of the building where he resided, police officers requested and received permission to go to the defendant's apartment to discuss the situation. The reason the officer gave for the request was that there was insufficient privacy outside, it was raining, and they wished to separate the protagonists. Id. at 258. The officers did not request or receive permission to search the apartment, but one of the officers moved about the apartment "for safety" reasons although the defendant told him that no one was present. Id. at 259. A .45 caliber bullet in plain view led to a further search and ultimately to a search warrant that resulted in the discovery of a gun and additional ammunition. Id. at 259–60.

Rejecting the application of the protective sweep doctrine for lack of an essential element, in Gandia we found that there was "nothing in the record from which a reasonable police officer could have inferred that there was a specific danger of unknown third-parties hiding in [defendant's] apartment." Id. at 264. With respect to the question of consent, we provided this caveat: "Although we do not decide this issue, we do note that when police have gained access to a suspect's home through his or her consent, there is a concern that generously construing Buie will enable and encourage officers to obtain that consent as a pretext for conducting a warrantless search of the home." Id. at 262. And with further respect to the basis for entry in the application of the protective sweep doctrine, we had this to say in Gandia: "In the instant case — unlike when officers enter a suspect's home in order to execute an arrest warrant or under exigent circumstances — there was no need for the police officers to enter [defendant's] home in the first place. They were there for their own convenience (and perhaps for his) while taking his statement." Id. at 263.

-12-

There exists a circuit split amongst our sister circuits relevant to the proper basis for entry into a home in connection with the conduct of a protective sweep. The Ninth and Tenth Circuits have applied the protective sweep doctrine only where entry has been made incident to an arrest in the home, declining to extend the specific parameters of the doctrine as announced in Buie. See United States v. Torres-Castro, 470 F.3d 992, 997 (10th Cir. 2006) (noting, in connection with application of the doctrine that "protective sweeps must be performed incident to an arrest"); United States v. Reid, 226 F.3d 1020, 1028 (9th Cir. 2000) (concluding "that the warrantless search of apartment 101" was not a protective sweep and was not justified by exigent circumstances).

The First, Fifth, Seventh, and D.C. Circuits have extended the doctrine to allow protective sweeps of living quarters in non-arrest situations. See United States v. Martins, 413 F.3d 139, 149 (1st Cir. 2005) (holding, where a boy was in need of emergency assistance and "notwithstanding the absence of a warrant, the officer's entry into the defendant's apartment was justified by exigent circumstances"); Leaf v. Shelnutt, 400 F.3d 1070, 1087 (7th Cir. 2005) (upholding protective sweep where exigent circumstances, suspicion of burglary, justified entry, and officers "had substantial reason to believe that their safety might have been at risk"); United States v. Gould, 364 F.3d 578, 590 (5th Cir. 2004) (in banc) (holding prospective sweep valid where officers admitted to a mobile home by co-occupant "for a legitimate governmental purpose," i.e., to question the defendant about threats); United States v. Taylor, 248 F.3d 506, 513 (6th Cir. 2001) ("[T]he principle enunciated in Buie with regard to officers making an arrest — that the police may conduct a limited protective sweep to ensure the safety of those officers — applies with equal force to an officer left behind to secure the premises while a warrant to search those premises is obtained."); United States v. Patrick, 959 F.2d 991,

996–97 (D.C. Cir. 1992) (upholding a protective search where "police were lawfully on premises" pursuant to consent of the lessee to search the apartment and, under the circumstances, the occupant's bedroom).

II.     The Protective Sweep Doctrine and the Search of Hassock's Bedroom

Although we have joined the majority of our sister circuits to the extent that they conclude "that specific, articulable facts giving rise to a reasonable inference of danger may justify a protective sweep in circumstances other than during the in-home execution of an arrest warrant," Miller, 430 F.3d at 100 (emphasis supplied), we have done so only in a case where officers entered a home "under lawful process," in that case an order of protection, id. at 98.  The government recognizes that we have yet to decide whether a protective sweep may be conducted where officers enter a dangerous suspect's home incident to another purpose and urge us to follow the lead of the Fifth and D.C. Circuits, which have permitted protective sweeps where consent has been obtained for entry.

In Gould, the Fifth Circuit found that the officers were "in the mobile home for a legitimate governmental purpose," and that purpose was to question the defendant about information they had received about the defendant's threat to kill two judges.  Gould, 364 F.3d at 590.  The police were admitted to the trailer by another resident, who indicated that defendant was probably asleep in his bedroom and that the police "could come in and check it out."  Id. at 588.  As in the case at bar, the resident had no authority to consent to the search of the bedroom, but the police entered it for safety reasons and there observed rifles that were to become the subject of the motion to suppress.  Id.  In reversing the district court's order of suppression, the in banc Circuit Court concluded that a protective sweep was valid under the circumstances, all the essential elements specified in Buie

-14-

having been established and the officers having gained entry to the mobile home for the legitimate purpose of interviewing the defendant. Id. at 593.

Similarly, in United States v. Patrick, 959 F.2d 991 (D.C. Cir. 1992), the D.C. Circuit held that "[o]nce the police were lawfully on the premises, they were authorized to conduct a protective sweep." 959 F.2d at 996. There, the lessee of an apartment requested the assistance of the police in removing an occupant of the apartment who apparently refused to leave. The police were admitted to the apartment by the lessee, found four people in the living room, and proceeded to a bedroom, where they found the occupant, discovered drugs and drug paraphernalia in plain view, and conducted a further search in which they found, inter alia, a gun under the bed. The firearm and drug contraband seized during the search formed the basis for various charges against the occupant, who sought to suppress these items from use at his trial. The D.C. Circuit determined that the lessee was authorized to consent to the search of the occupant's bedroom since the occupant was a "squatter" in the apartment. Id. The court opined that the "lawful presence" of the police on the premises with the consent of the lessee provided them with sufficient "authori[ty] to conduct a protective sweep based on their reasonable belief that one of the [apartment's] inhabitants was trafficking in narcotics." Id. The court reasoned that the plain view doctrine provided the police officers with authority to seize the drugs and that this observation provided the probable cause to search the area under the occupant's immediate control, including the area under the bed. Id.

In this case, it is not necessary to determine whether the protective sweep exception is limited to situations involving the execution of legal process (as was the case in Miller) or extends (as the government urges) to any situation where police are lawfully

-15-

on the premises for a legitimate governmental reason antecedent to the sweep. Certainly the agents here had no legal process and, although they went to the Hassock apartment with a legitimate purpose — the questioning and possible arrest of Hassock — when Hassock did not answer the door, that purpose could not be pursued until Hassock was found. Under these circumstances, the sweep cannot be viewed as a reasonable security measure incident to Hassock's interrogation or arrest. Instead, the "sweep" itself became the purpose for the agents' continued presence on the premises insofar as they thereby searched the location for Hassock. As the district court found, it may have been objectively reasonable for agents to think that Hassock's presence on the premises posed a danger to their safety. See Untied States v. Hassock, 676 F. Supp. 2d at 158–59. But a protective sweep is reasonable only to safeguard officers in the pursuit of an otherwise legitimate purpose. Where no other purpose is being pursued, a sweep is no different from any other search and, therefore, requires a warrant, exigency, or authorized consent, none of which were present here. Specifically, it was not apparent to the agents of the task force that the young woman who admitted them to the apartment was clothed with any authority that would allow her to consent to a search of the premises. Her discussion with the agents was very brief — she said she had just awakened, that she did not know who was present in the apartment, and answered in the affirmative in response to an agent's request to "look around." It was not until after the search was complete that the agents spent some time with the woman, learned her identity, her relationship with the co-tenant of the apartment, and other information. And so it was that, with the limited information available and without ascertaining the woman's authority to consent, the officers pressed forward in a search for Hassock. (The government concedes that there was no authority of any kind to enter Hassock's bedroom). The original purpose of the

-16-

"knock and talk" thereupon became an illegitimate search for Hassock incident to no other lawful police conduct, which cannot be characterized as a protective sweep.

In a post-argument submission, the government asserts that a legitimate investigative purpose for a protective sweep after the initial meeting with the woman was, based on her questionable consent, to look around the "common area" of the apartment to locate Hassock and to determine whether he was "willing to be interviewed." The government did not advance this theory in the District Court, presenting no evidence that would allow the District Court to assess its credibility, let alone its legal sufficiency. Accordingly, we deem it forfeited on appeal. See, e.g., Kendall v. Emps. Ret. Plan of Avon Prods., 561 F.3d 112, 123 (2d Cir. 2009). Further, the original purpose of the investigation was not to interview the woman (which they did not do until long after the search was completed) or to search for Hassock, but to talk to him and possibly arrest him. In pressing past the sole known occupant of the apartment and going forward with the search of the apartment, the purpose of the agents was to locate Hassock and then to return to their initial purpose of talking to him. Under the circumstances, the officers undertook a full search for the object of their inquiry rather than a protective sweep incident to an independent lawful purpose. They did so without a warrant, proper consent, exigent circumstances, or even probable cause to believe that Hassock was present. To the extent that our sister circuits hold differently under similar circumstances, we respectfully decline to follow their lead.

**CONCLUSION**

For the foregoing reasons, we affirm the judgment of the District Court suppressing the firearm found in Hassock's bedroom.