**UNITED STATES of America**

v.

**Jesus Omar MEDINA and Maximo Cuevas, Defendants.**

**No. 03 CR. 268(DC).**

United States District Court, S.D. New York.

Feb. 10, 2004.

David N. Kelley, United States Attorney for the Southern District of New York by Joshua Levine, Esq., Assistant United States Attorney, New York City, for Plaintiff U.S.

Goldstein & Weinstein by David J. Goldstein, Esq., Bronx, NY, for Defendant Maximo Cuevas.

Gregory Cooper, Esq., New York City, for Defendant Jesus Omar Medina.

## MEMORANDUM DECISION

CHIN, District Judge.

On February 3, 2003, Drug Enforcement Administration ("DEA") agents arrested defendants Jesus Omar Medina and Maximo Cuevas in an apartment in Queens, New York. The agents seized a Nordstrom shopping bag containing $130,000 in cash, two duffle bags containing another $1.4 million in cash, a money counting machine, a kilo of cocaine, and a handgun.

Medina and Cuevas have been indicted for conspiracy to distribute and possess

with intent to distribute cocaine in violation of 21 U.S.C. § 846. Before the Court is defendants' motion to suppress the evidence on the grounds their rights under the Fourth Amendment were violated. For the reasons that follow, the motion is denied.

## STATEMENT OF THE CASE

### A. *The Facts*

Based on the evidence presented at the suppression hearing held on October 30, 2003, I make the following findings of fact:

On February 3, 2003, DEA agents were conducting surveillance in the vicinity of 1520 202d Street in Queens. The agents had information indicating that an individual named Firsy Molina lived in that building and that he was in possession of $1.4 million in drug proceeds. The agents also had information suggesting that Molina was involved in a shipment of 265 kilos of cocaine. Some of this information came from wiretaps and surveillance established after a van had been seized in Pennsylvania carrying 265 kilos of cocaine. (10/30/03 Tr. 5–6, 11, 34).

At approximately 1:05 p.m., the agents saw Cuevas exit the building and enter a white Lincoln Continental. The agents had information that the white Lincoln was a vehicle used by Molina and his associates. Group Supervisor Richard Bendekovic followed the white Lincoln, driving from Queens into Manhattan. Bendekovic lost the vehicle in Manhattan. He then drove back to Queens to resume surveillance outside 1520 202d Street. (*Id.* 13–14, 29, 86).

At approximately 4:30 p.m., Cuevas returned in the white Lincoln and parked. Bendekovic saw Cuevas exit the vehicle and retrieve a shopping bag from the trunk and a white plastic bag from the backseat. Carrying both bags, Cuevas walked to the building located at 1520 202d Street. (*Id.* 14–15).

Bendekovic exited his vehicle and started walking behind Cuevas. Cuevas entered the vestibule area of the building, followed closely behind by Bendekovic. In the vestibule, Bendekovic saw Cuevas press a button on the call box panel for apartment 6G. Bendekovic pressed another button, as if he were attempting to buzz a different apartment. (*Id.* 15–16).

Cuevas received no response from Apartment 6G. He placed the shopping bag—a Nordstrom's department store bag—on the floor of the vestibule and made a telephone call using his cell phone. He turned away from Bendekovic and spoke into the cell phone in a low voice. Bendekovic peered into the bag and saw an empty, thin, white bag and a white cloth—which turned out to be a tee-shirt—on top of what appeared to be U.S. currency wrapped in cellophane in brick form. (*Id.* 16–17, 40, 43, 47, 50, 53, 89, 116–17).

Bendekovic pretended to make a cell phone call himself and left the vestibule, walking out to the front of the building. He gestured for the other agents waiting outside to join him. They did so. Bendekovic and the other agents entered the vestibule. Cuevas was gone, however, as he had entered the hallway of the building. (*Id.* 17).

One of the agents pressed the building superintendent's call button and the agents were buzzed into the hallway. Bendekovic saw Cuevas directly in front of him, in the elevator, as the elevator door was closing. (*Id.*).

Bendekovic and the other agents entered the stairwell and ran up six flights of stairs. They flung open the stairwell door and entered the sixth floor hallway. There, they saw both Cuevas and Medina. Cuevas was about to enter apartment 6G. (*Id.* 18, 19–20, 98).

Moving briskly, Bendekovic walked by Medina and approached Cuevas, who was standing in the threshold of apartment 6G, with the door open. Bendekovic displayed his credentials and identified himself as an agent. He did not have his weapon drawn, nor did he see any other agents draw their weapons. Initially, there were three other agents. A fourth joined later. Bendekovic told Cuevas that he wanted to talk to him and asked Cuevas if he would mind talking inside the apartment rather than out in the hallway. Cuevas said yes. Bendekovic did not give Cuevas the option of remaining in the hallway, nor did he specifically ask if the other agents could also go into the apartment. The conversation with Cuevas started in Spanish and then moved to English. (*Id.* 18–19, 56–58, 62–63, 112).

Bendekovic also spoke to Medina, in Spanish. Bendekovic told him that he and the others were agents and asked whether he would mind talking to them inside the apartment. Medina responded that he did not mind. (*Id.* at 19).

Cuevas, Medina, Bendekovic, and the other agents—there were now four others—moved into the apartment. The agents did not tell Cuevas and Medina that they were under arrest, nor did the agents read them their *Miranda* rights, nor did the agents touch them or use any physical force. Inside the apartment, Bendekovic took 15 or 20 seconds to catch his breath. Bendekovic again identified himself. At least one of the other agents had a badge around his neck. (*Id.* 20–21, 60, 62, 92, 112).

The Nordstrom bag was on the floor, between Bendekovic and Cuevas. Bendekovic asked Cuevas if the bag was his. Cuevas said that he had brought the bag to deliver it to Medina and he did not know what was in it. This conversation started in Spanish but was carried out primarily in English. Bendekovic then turned to Medina and asked him if he knew that Cuevas was bringing the bag to him and whether he knew anything about it. Medina responded that he did not know anything about the bag, he had never seen it before, and it was not his. This conversation was in Spanish. (*Id.* 20–21, 60).

Bendekovic then reached into the bag and pulled the white plastic bag and cloth-like material off the top. He saw underneath several bundles of currency in brick form, wrapped in cellophane. He removed the currency and set it down on the floor next to the bag. He asked Medina and Cuevas for permission to search the apartment, and they responded that they did not live there. Bendekovic then instructed two of the agents to conduct a security sweep of the apartment. They had been in the apartment for less than ten minutes at that point. Bendekovic had not been worried about their security when they first entered the apartment; still, he had some concern, for the agents had not been in every room of the apartment and he wanted to ensure that there was no one else in the apartment. (*Id.* 22, 62–63, 103, 111).

Within five or seven minutes, the two agents completed their security sweep and informed Bendekovic that they had found a large brown duffle bag and a large green duffle bag in a bedroom closet. One of the bags had been open, showing a large quantity of U.S. currency inside. The agents also found what appeared to be a tally sheet, showing 700,000 written next to the entry "malatin verde," or green bag, and 700,000 written next to the entry "malatin café," or brown bag. (*Id.* 22–23).

The agents subsequently obtained a search warrant. Upon executing the warrant, they found, in addition, a .25 caliber semi-automatic pistol, a money counting machine, and approximately a kilo of cocaine. (GX 3501–4; GX 3502–1).

## B. *Prior Proceedings*

Molina, Medina, and Cuevas were indicted on March 4, 2003 and charged with one count of narcotics conspiracy. Molina has pled guilty.

Cuevas moved to suppress the physical evidence seized on February 3, 2003, as well as statements he had made. In an affidavit in support of the motion, he stated under oath that:

> When I entered the building, I was carrying a paper bag. Nothing was visible inside the bag, except some clothing at the top.
>
> ... When I entered the lobby, there was no one close enough to me to be able to see into the bag and no one observed the specific apartment for which I buzzed the bell because I never buzzed a bell as I called over my cell phone to let me in. When I arrived at apartment 6G, I was talking to the co-defendant at the doorway. A number of police officers arrived, grabbed me, physically pushed their way into the apartment and took me inside as well. They immediately searched the bag that I brought into the building and the apartment as well. They did not ask or receive the permission of anyone to do that.

(Cuevas Aff. ¶¶ 5, 6). In his memorandum of law, Cuevas asserts that "[h]e was approached at gunpoint and physically restrained" by the agents. (Cuevas Mem. 6).

Medina did not submit an affidavit or any other motion papers, but he has joined in Cuevas's motion.

I held a hearing on October 30, 2003. Bendekovic was the sole witness for the Government. Neither Cuevas nor Medina took the stand. Cuevas withdrew the prong of the motion seeking to suppress his statements. (10/30/03 Tr. 122).

Defense counsel requested and were given an opportunity to submit an additional memorandum of law. (*Id.* 122–24). They did not do so. I heard argument on the motion on January 20, 2004 and reserved decision.

### DISCUSSION

Defendants' motion raises four issues: (a) whether the agents had a reasonable basis to "stop" defendants in the sixth floor hallway;[1] (b) whether defendants voluntarily consented to the entry of the agents into the apartment; (c) whether defendants abandoned the Nordstrom bag inside the apartment; and (4) whether the agents exceeded the permissible scope of a "protective sweep" when they found the two duffle bags. I consider each issue in turn.

### A. *The Stop*

Defendants argue that their Fourth Amendment rights were violated because the DEA agents did not have a reasonable basis to stop them in the sixth floor hallway—they contend the agents did not have "specific, articulable facts to support the conclusion that [defendants were] engaged in criminal activity." (Cuevas Mem. 3). Although Cuevas's motion papers are far from clear, in their oral presentations defense counsel clarified the point: Bendekovic's testimony is not credible, his version of what occurred on February 3, 2003 is not plausible, and the agents did not have a reasonable basis to stop Medina and Cuevas in the sixth floor hallway.[2]

---

1. The Government argues that the encounter in the hallway was consensual. Without deciding the issue, I assume the encounter was not consensual and I proceed to the Government's fallback argument that the agents had "reasonable suspicion" to stop defendants.

2. Defendants have clarified that they are not arguing that there was a stop or seizure of Cuevas in the first floor vestibule of the building. (1/20/04 Tr. 4–5).

### 1. *Applicable Law*

The Fourth Amendment prohibits unreasonable searches and seizures. *See Skinner v. Railway Labor Executives' Ass'n,* 489 U.S. 602, 619, 109 S.Ct. 1402, 103 L.Ed.2d 639 (1989); *see also United States v. Blue,* 78 F.3d 56, 59 (2d Cir.1996). In determining the reasonableness of a search, a court must balance the intrusion on an individual's privacy interest against the Government's interest in conducting the search. *See Maryland v. Buie,* 494 U.S. 325, 331, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). While a search generally may not be conducted without a warrant issued upon a showing of probable cause, in some circumstances neither a warrant nor probable cause is required. *Id.*

In *Terry v. Ohio,* 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968), the Supreme Court recognized one exception to the probable cause requirement. Under *Terry* and its progeny, an investigating officer may briefly detain an individual for questioning so long as the officer has "a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot.'" *United States v. Sokolow,* 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (quoting *Terry,* 392 U.S. at 30, 88 S.Ct. 1868). Such a limited stop does not offend the Constitution, even though probable cause for an arrest may be lacking. *See Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581.

Reasonable suspicion requires that the officers be aware of "specific articulable facts" that, together with rational inferences from those facts, "reasonably warrant suspicion" that the individual was engaging in or was about to become engaged in criminal activity. *United States v. Brignoni–Ponce,* 422 U.S. 873, 884, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975). The Fourth Amendment requires "some minimal level of objective justification" for making the stop. *INS v. Delgado,* 466 U.S. 210, 216–17, 104 S.Ct. 1758, 80 L.Ed.2d 247 (1984). A mere "inchoate and unparticularized suspicion or 'hunch'" will not suffice. *Sokolow,* 490 U.S. at 7, 109 S.Ct. 1581 (quoting *Terry,* 392 U.S. at 27, 88 S.Ct. 1868).

In determining the existence of reasonable suspicion, the facts must be judged against an "objective standard." *Terry,* 392 U.S. at 21, 88 S.Ct. 1868. That is, the court must determine whether "the facts available to the officer at the moment of the seizure or the search 'warrant a [person] of reasonable caution in the belief' that the action taken was appropriate." *Id.* at 21–22, 88 S.Ct. 1868 (quoting *Carroll v. United States,* 267 U.S. 132, 162, 45 S.Ct. 280, 69 L.Ed. 543 (1925)). Finally, in evaluating the validity of a *Terry* stop, a court must consider "the totality of the circumstances." *United States v. Cortez,* 449 U.S. 411, 417, 101 S.Ct. 690, 66 L.Ed.2d 621 (1981).

The Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop. *United States v. Perea,* 986 F.2d 633, 644–45 (2d Cir.1993); *United States v. Pena,* 961 F.2d 333, 338–39 (2d Cir.1992).

### 2. *Application*

The issue of whether Bendekovic and the other agents were aware of specific and articulable facts sufficient to support a reasonable suspicion that Cuevas and Medina were engaging in criminal conduct turns on a number of questions: a) was Bendekovic's hearing testimony credible? b) if so, what did he know? c) was that a sufficient basis to suspect that criminal activity was afoot? and d) did the agents respond in a reasonable and appropriate manner?

### a) *Was Bendekovic Credible?*

As my findings of fact above suggest, I found Bendekovic to be a credible witness overall. To be sure, there were some aspects of his testimony that gave me pause. For example, it is not logical, as Bendekovic testified, that Cuevas would have held onto the bag of fast food while placing on the floor—and turning his back on—the bag containing $130,000 in cash. On the other hand, as the Government noted, Cuevas remained in the vestibule, immediately next to the bag, and the money was supposed to be covered by a plastic bag and tee-shirt. (1/20/04 Tr. at 22). Moreover, as experience tells us, individuals who break the law often engage in conduct that does not make sense.

In addition, the record contains no credible evidence to contradict Bendekovic's testimony. Neither Medina nor Cuevas was willing to take the stand. Medina did not submit an affidavit or any papers at all. Cuevas did submit an affidavit, but his affidavit is wholly conclusory and is not credible when compared to Bendekovic's detailed testimony, which held up well when tested by defense counsel's cross-examination. Accordingly, Bendekovic's testimony is credited.

### b) *What Did Bendekovic Know?*

Bendekovic testified to the following specific and articulable facts: The agents had reason to suspect, from wiretap and other information, that $1.4 million in drug proceeds were stashed in apartment 6G at 1520 202d Street. They had reason to believe, from information obtained as a result of the seizure of the van, that Molina was possibly connected to a shipment of 265 kilos of cocaine. They believed that Molina and his associates used the white Lincoln. They saw Cuevas walk out of 1520 202d Street and leave in the white Lincoln. They saw Cuevas return in the white Lincoln and re-enter 1520 202d Street. Ben-dekovic saw him press the bell for apartment 6G. Bendekovic saw what appeared to be bricks of U.S. currency wrapped in cellophane in the Nordstrom bag that Cuevas had been carrying. Bendekovic and the other agents then saw Cuevas on the sixth floor, with Medina, in the hallway, with the door to apartment 6G ajar.

### c) *Were These Facts Sufficient?*

These specific and articulable facts provided Bendekovic and the others with a reasonable basis to suspect that Cuevas and Medina were in the process of transporting or delivering proceeds of illegal activity. The agents had more than a mere "inchoate and unparticularized suspicion or 'hunch.'" They had concrete information obtained as a result of the stop of the van, from the resulting wiretaps and surveillances, and from their personal observations on February 3, 2003. These facts were sufficient to support a finding of reasonable suspicion.

### d) *Was The Agents' Response Reasonable?*

The agents' response was reasonable. Under all the circumstances, they were justified in making an investigatory stop. *See, e.g., United States v. $557,933.89 in U.S. Funds,* 287 F.3d 66, 81 (2d Cir.2002) (reasonable suspicion exists to detain bag where blank money orders found); *United States v. Ocampo,* 650 F.2d 421, 427 (2d Cir.1981) (visibility of currency in open paper bag a factor giving agents probable cause to search and seize it); *see also United States v. Buchner,* 7 F.3d 1149, 1155 (5th Cir.1993) (visibility of "spot of green" at opening of bag contributing to probable cause for warrantless search). The agents acted reasonably and appropriately in deciding to question Cuevas and Medina and in asking them if they could

do so in the apartment rather than out in the hallway.

Accordingly, the "stop" of Cuevas and Medina in the hallway did not violate the Fourth Amendment.

## B. *Consent*

Defendants argue that they did not "freely and voluntarily" consent when the agents asked to enter the apartment. (Cuevas Mem. 8). Even assuming they assented, defendants argue, they were merely acquiescing to the agents' show of authority and they were coerced into letting the agents into the apartment. (1/20/04 Tr. 10–11).

### 1. *Applicable Law*

A warrantless entry does not violate the Fourth Amendment if " 'authorities have obtained the voluntary consent of a person authorized to grant such consent.'" *United States v. Hernandez,* 85 F.3d 1023, 1028 (2d Cir.1996) (quoting *United States v. Elliott,* 50 F.3d 180, 185 (2d Cir.1995), *cert. denied,* 516 U.S. 1050, 116 S.Ct. 715, 133 L.Ed.2d 669 (1996)). To be voluntary, a person's consent must be " 'a product of that individual's free and unconstrained choice, rather than a mere acquiescence in a show of authority.'" *United States v. Garcia,* 56 F.3d 418, 422 (2d Cir.1995) (citations omitted). Consent is not voluntary if it is the product of "duress or coercion," but duress and coercion are not established merely by "the fact of arrest," or by a representation that a warrant will be obtained if consent is withheld, or by the fact a defendant is handcuffed. *United States v. Kon Yu–Leung,* 910 F.2d 33, 41 (2d Cir.1990). The Fourth Amendment does not require a "knowing and intelligent waiver" of one's rights for a finding of consent; rather, an individual may consent even without knowledge that he has the right to withhold consent, although knowledge of the right to refuse consent is a factor that may

be considered in determining voluntariness. *Garcia,* 56 F.3d at 422.

The determination of whether a person has voluntarily consented "is essentially a fact-based inquiry that must be 'determined by the totality of all the circumstances.'" *United States v. Peterson,* 100 F.3d 7, 11 (2d Cir.1996) (quoting *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)). The factual inquiry is guided by an "objective standard," and the question is whether "the officer had a reasonable basis for believing that there had been consent to the search." *Garcia,* 56 F.3d at 423 (citations omitted); *see also Florida v. Jimeno,* 500 U.S. 248, 251, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) ("The standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness—what would the typical reasonable person have understood by the exchange between the officer and the suspect?").

### 2. *Application*

Here, both Medina and Cuevas verbally consented to the officers' entry into the apartment. That consent was voluntarily given. Although there were five agents present, their weapons were not drawn and they did not use any physical force. Cuevas and Medina had not yet been arrested and they had not been placed in handcuffs. Bendekovic, who is fluent in Spanish, spoke to Medina in Spanish and to Cuevas in both English and Spanish, and both Medina and Cuevas understood what Bendekovic was saying. The agents did not threaten to obtain a search warrant if consent were withheld, *see Garcia,* 56 F.3d at 423, nor did they make any other threats. Moreover, Cuevas and Medina knew how to say no; when Bendekovic later asked for permission to search the apartment, they declined by

saying the apartment was not theirs. *See also United States v. Garcia,* 339 F.3d 116, 119–20 (2d Cir.2003) (defendant's wife's "verbal consent" to officers' entry into home was "knowing and voluntary in light of the fact that she was a 'poised and well-spoken witness' who 'speaks both English and Spanish and is employed outside the home by a social services organization' "); *United States v. Moreno,* 897 F.2d 26, 33 (2d Cir.1990) (upholding district court's finding that defendant had consented to search of apartment where defendant consented to the search in vestibule building after a brief period of detention, he was not physically abused or verbally threatened, and no weapons were displayed).

Even assuming Medina and Garcia felt pressured when they assented to the agents' request to enter the apartment, and even assuming they did not know they had the right to withhold consent, the agents had no reason to believe that Medina and Cuevas did not mean what they said. When Medina and Cuevas both said yes to the agents' request, the agents were not required to cross-examine them to ensure that they meant it. The agents had a reasonable basis to believe that consent had been voluntarily given.

## C. *Abandonment*

Defendants argue that the Government has failed to demonstrate that Medina and Cuevas abandoned the Nordstrom bag once they were inside the apartment.

### 1. *Applicable Law*

 It is well-settled that when an individual voluntarily abandons his property, "he forfeits any reasonable expectation of privacy that he might have had in the property." *United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990). Accordingly, "[t]here can be nothing unlawful in the Government's appropriation of such abandoned property." *Abel v. United States,* 362 U.S. 217, 241, 80 S.Ct. 683, 4 L.Ed.2d

668 (1960); *see United States v. Welbeck,* 145 F.3d 493, 495, 498 (2d Cir.1998) (holding that defendant could not claim privacy interest in bag placed under nearby seat on train, where he denied that bag was his); *United States v. Springer,* 946 F.2d 1012, 1014, 1017 (2d Cir.1991) (agents did not violate Fourth Amendment when they seized suitcase that defendant had been carrying in bus terminal, where defendant denied the suitcase was his and suggested he had picked up the wrong suitcase).

 The key is the intent of the individual who purportedly abandoned the property, and "intent may be inferred from words spoken, acts done, and other objective facts." *United States v. Lee,* 916 F.2d 814, 818 (2d Cir.1990) (quoting *United States v. Colbert,* 474 F.2d 174, 176 (5th Cir.1973)).

### 2. *Application*

 Here, Medina and Cuevas cannot claim a Fourth Amendment violation based on the agents' seizure of the Nordstrom bag inside the apartment, for they disavowed any property interest in it. Cuevas said he had brought the bag to deliver it to Medina and he did not know what was in it. Medina said that he did not know anything about the bag, he had never seen it before, and it was not his. Neither objected when Bendekovic reached for the bag and removed its contents. By their words and actions, Medina and Cuevas made clear their intent to distance themselves from the bag and to abandon whatever interest they had in it.

Cuevas now argues that he did not abandon the bag in that he merely said that he was delivering it to Medina and did not know what was in it. But Medina was standing right there and disclaimed any interest in the bag. Cuevas did not then reclaim the bag or object when Bendekovic

reached for it. Under these circumstances, Cuevas abandoned the bag.

Both Cuevas and Medina argue that even assuming they disclaimed any interest in the bag, the agents had no right to seize it because they were inside the apartment and not out in the public. In essence, they argue that the abandonment doctrine does not apply because they were inside a private residence. In the circumstances here, however, where Cuevas brought the bag into the apartment but disclaimed any interest in it and Medina denied that the bag was his, the agents acted reasonably in seizing the bag, for both Medina and Cuevas disavowed any interest in it. Even assuming Cuevas and Medina had a privacy interest in the apartment, there remains the separate issue of whether they had a privacy interest in the bag. They did not. As the Second Circuit has held, "[w]hen considering the legality of a search of an object within a home, courts have properly focused on the defendant's expectation of privacy in the *object* apart from his expectation of privacy in the home." *United States v. Haqq,* 278 F.3d 44, 50 (2d Cir.2002) (emphasis added); *see also United States v. Alvarez,* 6 F.3d 287, 289 (5th Cir.1993) (defendant abandoned garment bag in motel room in which he was arrested and therefore lacked standing to challenge search of the bag).

## D. *The Protective Sweep*

Finally, defendants argue that the agents exceeded the scope of a protective sweep. They argue that when the officers entered the apartment, they were not actually concerned for their safety and they did not conduct the purported "security sweep" for some time. They argue that the purported security sweep was a sham and that the agents' real intent was to uncover evidence before they could obtain a search warrant. (1/20/04 Tr. 20–21).

### 1. *Applicable Law*

In certain circumstances, law enforcement officers may conduct protective sweeps incident to lawful arrests to ensure their safety. *See Maryland v. Buie,* 494 U.S. 325, 334, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). Thus, an officer effecting an arrest may lawfully "look in closets and other spaces immediately adjoining the place of arrest from which an attack could be immediately launched." *Id.* An officer arresting someone in a residence may, in certain circumstances, search an adjoining room to ensure there is no one else there. *See United States v. Lauter,* 57 F.3d 212, 216–17 (2d Cir.1995).

In *Lauter,* agents arrested the defendant in the first room of a small, two-room apartment. Although a prior agent had already looked in the back room, a second agent conducted a sweep of the back room. He saw, in a space between the bed and a wall, a gun. *Id.* at 213, 216–17. The court held this was a proper protective sweep: "As the gun was in plain view and [the agent] was legitimately in the room, seizure of the weapon was permissible." *Id.* at 217.

### 2. *Application*

Here, the agents did not exceed the scope of a permissible protective sweep. The agents had not yet looked in any of the other rooms. Both Medina and Cuevas said it was not their apartment, thus raising at least the possibility that there was someone else present. Although Bendekovic testified that he was not concerned about his safety when they first entered the apartment, he also testified that he had some concern because the agents had not been in every room of the apartment and he wanted to ensure that there was no one else in the apartment. Moreover, Bendekovic did not order the protective sweep until after he discovered

the $130,000 in cash in the Nordstrom bag wrapped in cellophane in brick form; this discovery surely gave him more cause to be concerned, as the cash confirmed that substantial narcotics activity was afoot. It was certainly prudent law enforcement practice for the agents at that point to check the other rooms, including the closets, to make sure no one else was present. When the agents saw the two duffle bags in plain view (in a closet), with one open and showing cash inside, they were entitled to seize them. *See Maryland v. Buie,* 494 U.S. at 334, 110 S.Ct. 1093 (as part of protective sweep, agents could lawfully look to see whether any one was hiding in closets).

Defendants argue that the agents did not conduct a legitimate security sweep because there was a "10– to 15–minute delay in ordering the security sweep." (1/20/04 Tr. 14). The argument is rejected. First, the delay was not 10 to 15 minutes; Bendekovic testified that it was less than 10 minutes. Second, the agents did not immediately arrest Medina and Cuevas. There were some initial discussion with them and then Bendekovic went through the Nordstrom bag, discovering the bricks of cash. Only then did the agents arrest Medina and Cuevas. They could not do a protective sweep until after the arrest.

### *CONCLUSION*

The Fourth Amendment prohibits unreasonable searches and seizures. Here, Bendekovic and the other agents acted in a reasonable, prudent, and appropriate manner. Accordingly, defendants' Fourth Amendment rights were not violated and their motion to suppress is denied. A pretrial conference will be held on February 24, 2004, at 4:30 p.m. The time until then is excluded for speedy trial purposes in the interest of justice.

SO ORDERED.