**UNITED STATES of America**

v.

**Alex RUDAJ, et al., Defendants.**

**No. 04 CR.1110 DLC.**

United States District Court, S.D. New York.

Oct. 3, 2005.

Timothy Treanor, Jennifer G. Rodgers, Benjamin Gruenstein, Assistant United States Attorneys, United States Attorney's

Office for the Southern District of New York, New York, NY, for U.S.

James Kousouros, Kew Gardens, NY, for Defendant Alex Rudaj.

## OPINION AND ORDER

COTE, District Judge.

Defendant Alex Rudaj ("Rudaj") has moved to suppress evidence seized without a warrant from his home on the morning of his arrest. A hearing was held on September 7, 2005. For the following reasons, the motion is granted in part.

### Background

At the hearing, the Government called two agents from the Federal Bureau of Investigation (FBI) to testify. The defendant did not testify. The following constitutes this Court's findings of fact.

On October 26, 2004, a team of agents from the FBI arrived at the large, single-family house where Rudaj and his family lived to serve an arrest warrant. This arrest was one of many that morning of the defendants indicted in this case. In a briefing prior to the arrest, the agents were told that several of the targeted individuals had not yet been accounted for, but the agents were given no reason to believe that anyone other than Rudaj and his family were at the Rudaj residence that morning. The lead agent on the Rudaj arrest team had also been told by another agent that Rudaj kept weapons in his home.

The agents arrived around 6:30 a.m. The agents first called the residence in an attempt to notify Rudaj and his family that they were outside, and then knocked on the front door of the house. A few minutes after the agents knocked, Rudaj opened the door and was handcuffed.

Because Rudaj answered the door in his underwear, the arresting agents escorted him back inside his house to get clothing for him to wear. The agents asked Rudaj if there were any weapons in the house and who else was in the house. Rudaj answered that there was a loaded hunting rifle by the bed, and that the only others in the house were his wife and children. The agents gathered the Rudaj family in a downstairs room and conducted a security sweep of at least the garage, basement, and the master bedroom. The lead agent testified that the purpose of the security sweep was to get Rudaj dressed and to remove him safely from the residence.

Two agents proceeded upstairs to perform a protective sweep of the master bedroom. The agents who had arrested Rudaj expected to find the clothing needed to dress Rudaj in that room. Upon entering the bedroom, the agents noticed two long guns on either side of a nightstand next to the bed. On top of a dresser were several bundles of U.S. currency and a collection of keys, among other items.

The agents then opened the door to a walk-in closet and noticed toward the rear of the closet the barrel of another rifle sticking up above clothing hung from the top rack. The gun was standing upright on a lower shelf and the most hotly contested factual dispute from the hearing is whether the top of the barrel was visible from the entrance of the closet. Having carefully studied the photographs of the interior of the closet and having observed the agents as they described the scene, I find that approximately five or six inches of the barrel of the gun was visible. The barrel extends thirteen inches past the gun's stock. A little less than half of that section would have been visible. This was sufficient to allow agents familiar with the appearance of firearms and already aware of the existence of rifles in the bedroom to recognize the barrel as part of a rifle. When they pushed the clothing back to secure the weapon, the agents discovered a

number of items including a second rifle, a handgun case, two knives, and transparent plastic bags containing ammunition and gun-cleaning supplies. The agents also lifted down a shoe box that was on a high shelf in the closet and opened it.

The agents continued the security sweep of the bedroom by looking into a second, smaller closet across the room. Although the closet contained mostly women's clothing, in the bottom corner, the agents noticed camouflage clothing, men's work boots, and a white plastic bag sitting on top of a cardboard box. Noting that the bag resembled the plastic bags found in the walk-in closet that had been used to store gun-related paraphernalia, the agents pulled the bag out of the closet by pulling out the box on which it rested. Their purpose was to inspect the bag more closely. The bag apparently did not contain anything of note, but when the officers inspected the box, they found a number of gun holsters, a taser, and handcuffs. For reasons which will become clear, it is unnecessary to decide whether the agents opened the box or whether they were simply able to see its contents once they removed the bag from on top of the box.

Having verified that nobody else was in the room, the two agents upstairs called down to the agent leading the arrest team to see what they had found. The team leader then called the Assistant United States Attorney, who instructed the agents to seize incriminating items that were in plain view. The agents proceeded to photograph what they intended to seize, and then prepared a detailed inventory and seized what they believed to be the incriminating items from the room. The agents recognized the keys as fitting in the types of padlocks that are often used on video gambling machines. Knowing that Rudaj was suspected of managing a number of gambling operations and was involved in picking up the money from those operations, the agents believed the keys to be incriminating evidence of the gambling activities.

In moving to suppress the items seized from his home, Rudaj asserted in an affidavit that the money was under folded shirts in his dresser and was not in plain view. Rudaj presented no evidence to support that contention at the hearing, and I find that the money was in plain view on top of the dresser. His affidavit also asserted that the two rifles in the master closet were "behind clothing." As already explained, I find that one was visible from the entrance to the closet and the other was in plain view when the officers entered the closet to seize the first rifle.

Although Rudaj's counsel had initially conceded that the agents were entitled to enter the master bedroom to retrieve clothing for him to wear, at the hearing he altered course and argued that the agents should have allowed Rudaj's wife to bring clothing from the master bedroom without being accompanied by the agents and that in any event all of the items the agents saw in the bedroom had to be suppressed because the agents entered the bedroom as part of an impermissibly broad protective sweep through the entire house.

## Discussion

By its terms, the Fourth Amendment prohibits only "unreasonable" searches and seizures. U.S. Const. amend. IV. But "[w]ith few exceptions, the question whether a warrantless search of a home is reasonable and hence constitutional must be answered no." *Kyllo v. United States*, 533 U.S. 27, 31, 121 S.Ct. 2038, 150 L.Ed.2d 94 (2001). Thus, when the government searches a citizen's home without a warrant, "the burden of showing that the search fell within one of the exceptions to the warrant requirement is on

the government." *United States v. Kiyuyung*, 171 F.3d 78, 83 (2d Cir.1999). "As in other Fourth Amendment contexts ... the 'reasonableness' inquiry ... is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham v. Connor*, 490 U.S. 386, 397, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989).

## I. Protective Sweep Incident to Arrest

The Government first characterizes the search of Rudaj's bedroom as a protective sweep incident to his arrest. For the reasons that follow, the search cannot be so justified.

■ The Fourth Amendment standard for protective sweeps conducted in the course of an arrest was laid out by the Supreme Court in *Maryland v. Buie*, 494 U.S. 325, 110 S.Ct. 1093, 108 L.Ed.2d 276 (1990). The Court held that "as an incident to the arrest," officers may "look in closets and other spaces immediately adjoining the place of arrest from which an attack could immediately be launched." *Id.* at 334, 110 S.Ct. 1093. This limited sweep may be conducted "as a precautionary matter and without probable cause or reasonable suspicion." *Id.*

■ If the officers wish to undertake a more wide-ranging sweep, however, "there must be articulable facts which, taken together with the rational inferences from those facts, would warrant a reasonably prudent officer in believing that the area to be swept harbors an individual posing a danger to those on the arrest scene." *Id.* "[G]eneralizations, without more, are insufficient to justify a protective sweep." *United States v. Moran Vargas*, 376 F.3d 112, 116 (2d Cir.2004). So too is a lack of information. *Id.* at 117. Moreover, "[t]he justification for a protective sweep is

ephemeral: it may last no longer than is necessary to dispel the reasonable suspicion of danger and in any event no longer than it takes to complete the arrest and depart the premises." *Moran Vargas*, 376 F.3d at 115 (citation omitted).

■ Yet even "if justified by the circumstances," a protective sweep is "aimed at protecting the arresting officers," *Buie*, 494 U.S. at 335, 110 S.Ct. 1093, not gathering evidence. It is therefore "not a full search of the premises, [and] may extend only to a cursory inspection of those spaces where a person may be found." *Id.* Nevertheless, "[p]atently incriminating evidence that is in plain view during a proper security check may be seized without a warrant." *Kiyuyung*, 171 F.3d at 83.

■ The seizure of evidence from the upstairs bedroom is proper as part of a protective sweep incident to arrest only if the search of the bedroom falls into one of the categories described in *Buie*. The first is clearly not applicable: the upstairs bedroom is by no means "immediately adjoining the place of arrest" when the arrest occurred on the doorstep of the home and the sweep encompassed a second floor bedroom. *See United States v. Lauter*, 57 F.3d 212, 216–17 (2d Cir.1995) (noting the relevance of "the small size of the apartment" in approving the search of a bedroom in a two-room apartment).

But the bedroom could be included in a protective sweep if the agents had "articulable facts that support an inference that the area to be swept harbors an individual posing danger to those present." *Id.* at 216. The Second Circuit has consistently demanded that this standard be met for protective sweeps beyond the area immediately adjoining the place of arrest. *See United States v. Blue*, 78 F.3d 56, 60 (1996) (concluding that a search cannot be justified as a protective sweep where the

officers have "failed to articulate specific reasons for their suspicion that the [area searched] harbored a dangerous person"); *United States v. Mickens*, 926 F.2d 1323, 1328 (2d Cir.1991) (upholding a search where "arresting officers had reason to believe that [other individuals]—both of whom resided in the house-were on the premises").

No such articulable facts were offered by the Government. The agents asked Rudaj if anybody aside from his wife and children (who were all accounted for downstairs at the time of the sweep of the master bedroom) were in the house, and Rudaj replied in the negative. The agents made no observations that morning that would lead them to believe that somebody else was at the Rudaj residence, nor had they received any prior information to that effect. On the contrary, the lead agent for the arrest team stated that the sweep of Mr. Rudaj's bedroom was intended "to ascertain whether or not there was anyone in the residence that could be a threat" and that "there was a possibility there could be additional people" present. But lack of information and unfounded speculation do not rise to the level of a specific, articulable basis for a reasonable belief. *See Moran Vargas*, 376 F.3d at 117. The Government has therefore not carried its burden, and the search of the upstairs bedroom (and closets therein) cannot be justified as part of a protective sweep incident to the arrest of Rudaj downstairs.

## II. Search of the Bedroom

█ The conclusion that the search was not proper either as incident to arrest or because of a reasonable belief that the bedroom harbored an individual posing a danger does not, however, end the Fourth Amendment inquiry. In its brief, the Government also argues that "because Rudaj was not dressed at the time of his arrest,

the agents were required to reenter the house so as to allow him to get dressed." The choice of verbs is apt: "courts routinely distinguish between the arrest itself and subsequent procurement of clothing for the arrestee, requiring independent justification for entry or reentry into a room or dwelling after the arrest itself has been completed." *United States v. Clay*, 408 F.3d 214, 218 (5th Cir.2005) (citing, *inter alia*, *United States v. Di Stefano*, 555 F.2d 1094, 1101 (2d Cir.1977)). If the agents' presence and seizure of evidence upstairs is to be justified, then, it must be as part of a separate legal entry into that portion of the Rudaj residence.

█ The Second Circuit has long recognized that an arresting officer has a duty to ensure that an arrestee is sufficiently dressed before removing her from her residence. *Di Stefano*, 555 F.2d at 1101. In the fulfillment of that duty, the officer may accompany the arrestee into the residence (or another part thereof) "to maintain a 'watchful eye' on her and to assure that she did not destroy evidence or procure a weapon." *Id.; see also Washington v. Chrisman*, 455 U.S. 1, 6, 102 S.Ct. 812, 70 L.Ed.2d 778 (1982) ("The officer had a right to remain literally at [the arrestee's] elbow at all times....").

Alternatively, the officers may choose to keep the arrestee in a secure location and send one of their own to get the clothing. *See Di Stefano*, 555 F.2d at 1101; *United States v. Titus* 445 F.2d 577, 578–79 (2d Cir.1971); *see also United States v. Gwinn*, 219 F.3d 326, 333 (4th Cir.2000) ("[T]he arrestee's partially clothed status may constitute an exigency justifying the officer's temporary reentry into the arrestee's home to retrieve clothes reasonably calculated to lessen the risk of injury to the defendant."). Either way, a warrantless entry is justified and an officer's presence in the arrestee's residence is lawful.

As with warrantless searches, warrantless seizures are also *"per se* unreasonable under the Fourth Amendment-subject only to a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). One of those exceptions is the "plain-view" doctrine. That doctrine "permits a law enforcement officer to seize what clearly is incriminating evidence or contraband when it is discovered in a place where the officer has a right to be." *Chrisman,* 455 U.S. at 5–6, 102 S.Ct. 812. If the officer does not recognize the incriminating nature of the evidence "without conducting some further search of the object—i.e., if its incriminating character [is not] immediately apparent—the plain-view doctrine cannot justify its seizure." *Minnesota v. Dickerson,* 508 U.S. 366, 375, 113 S.Ct. 2130, 124 L.Ed.2d 334 (1993) (citation omitted). In other words, the evidence must be "[p]atently incriminating." *Kiyuyung,* 171 F.3d at 83.

Applying these principles to the present case, it is clear that all evidence seized from the bedroom that was in plain view when the agents entered the bedroom is admissible. Rudaj had opened the front door, and was subsequently arrested, wearing only his underwear and a t-shirt. The arresting agents had a duty to provide clothing for him and a right to be in the bedroom to fulfill that duty.

Rudaj argues that the agents should not have been allowed to enter his house at all and suggests that the agents should have stayed outside while his wife went to get him clothing. That the agents might also have gotten the clothes this way is irrelevant. *See United States v. Mason,* 523 F.2d 1122, 1126 (D.C.Cir.1975) ("The agents undoubtedly could have taken measures which would have rendered a search of the closet unnecessary . . . , but the existence of alternative approaches does not imply that what actually occurred was unreasonable."). The agents were under a duty to provide Rudaj with clothing, but they were under no duty to let him or his family go upstairs unaccompanied to get the clothing. Moreover, they would have been constitutionally permitted to, and indeed foolish not to, accompany whoever went upstairs to ensure that she did not destroy evidence while there or return downstairs with a weapon. *See Washington v. Chrisman,* 455 U.S. at 6, 102 S.Ct. 812 (1982); *Di Stefano,* 555 F.2d at 1101. The evidence seized from the room would have fallen in the plain view of the accompanying officers, and its seizure would still have been appropriate.

Rudaj further argues that the agents always intended to do a security sweep of the entire house and would have done so even if Rudaj had been arrested fully clothed. The Fourth Amendment requires an agent's actions to be reasonable in the circumstances, and does not inquire into subjective intent. *See United States v. Dhinsa,* 171 F.3d 721, 725 (2d Cir.1998). The agents were permitted by the circumstances presented here to enter the bedroom to procure clothing for Rudaj. Whether they intended to enter the room in any event is irrelevant since it was entirely lawful for them to be in the room. *See Whren v. United States,* 517 U.S. 806, 814, 116 S.Ct. 1769, 135 L.Ed.2d 89 (1996) ("[T]he Fourth Amendment's concern with 'reasonableness' allows certain actions to be taken in certain circumstances, *whatever* the subjective intent.").

It is undisputed that the seizure from the bedroom of the two guns and the money on the dresser was lawful under the plain-view doctrine if the agents were entitled to be in the bedroom. Rudaj disputes, however, whether the keys lying on the dresser next to the stacks of money could be lawfully seized under that doctrine.

Rudaj did not give notice that he was challenging the seizure of the keys on the theory that their evidentiary value was not readily apparent. Through his cross-examination of the Government's witness, however, Rudaj's counsel challenged the seizure. Even though the Government was not prepared to present evidence on this issue at the hearing, the agents' testimony is sufficient to support the seizure.

The seizure of the keys was proper under the plain-view exception to the warrant requirement because the incriminating character of the keys was immediately apparent to the agents. The seizing agent had been informed prior to the arrest that Rudaj was believed to be involved in illegal gambling, and more specifically, to have participated in the weekly collections of money from gambling machines. The agent further recognized the keys on the dresser as matching the type of lock commonly used to secure gambling machines. In light of this information, the discovery of the keys in the immediate vicinity of large amounts of cash could fairly give rise to "probable cause to suspect that the [keys were] connected with criminal activity." *Illinois v. Andreas,* 463 U.S. 765, 771, 103 S.Ct. 3319, 77 L.Ed.2d 1003 (1983). "Put another way, it [would] have been 'immediately apparent' to the officer before seizing the [keys] ... that [they were] of a criminal character," and therefore subject to seizure under the plain-view doctrine. *United States v. Barrios–Moriera,* 872 F.2d 12, 16 (2d Cir.1989). Because the guns, money, and keys were clearly in plain view of the agents who entered the bedroom, and their incriminating nature was immediately apparent, the seizure of these items was proper. *Di Stefano,* 555 F.2d at 1101; *Titus,* 445 F.2d at 579 ("Everything the agents took was in their 'plain view' while they were where they had a right to be....").

## III.   Protective Sweep of the Closets

The seizure of evidence from the two closets is more problematic. The Government does not argue, and the evidence does not suggest, that the barrel of the gun protruding above the upper rack of clothing in the master closet was in plain view from the bedroom itself. Nor, significantly, does the Government argue that the discovery of the gun, which was in plain view upon entry into the closet, would have been inevitable in the course of procuring Rudaj's clothing, most of which, presumably, was kept in this closet. *See United States v. Ford,* 22 F.3d 374, 376–77 (1st Cir.1994) (applying the inevitable discovery rule to evidence seized during a protective sweep and not reaching the lawfulness of the sweep). Instead, the Government maintains that the search of the closets was proper as part of a protective sweep. Yet as explained above, the search of the closets exceeded the scope of a permissible sweep incident to an arrest. Moreover, the agents' presence in the bedroom must be considered a separate legal entry into the Rudaj residence. If the search of the bedroom closets is proper, then, it must be as part of a security sweep incident to this second entry.

■ The *Buie* Court did not address the question of whether the standard it articulated would apply to protective sweeps conducted in circumstances other than the execution of an arrest. To be sure, the standard is framed in terms of an arrest, but that may simply reflect the facts of that particular case. The Court did not explicitly limit its holding to such sweeps. "*Buie* gives no indication that circumstances other than arrest which expose police officers to a comparable danger could not also justify a similar protective response (at least where those circumstances are not the product of police ille-

gality or misconduct)." *United States v. Gould*, 364 F.3d 578, 581 (5th Cir.2004) (en banc); *see also United States v. Knights*, 534 U.S. 112, 117, 122 S.Ct. 587, 151 L.Ed.2d 497 (2001) (criticizing as "dubious logic" the argument "that an opinion upholding the constitutionality of a particular search implicitly holds unconstitutional any search that is not like it").

The Second Circuit has twice been confronted with this issue recently, but declined to reach it both times. *See United States v. Gandia*, 424 F.3d 255, 263–64; *Moran Vargas*, 376 F.3d at 115. It has, however, provided some guidance on how *Buie* should be interpreted. In one of its first cases applying *Buie*, the Court of Appeals explained that "*Buie* cannot be read in isolation, for its holding draws heavily from *Terry v. Ohio* and *Michigan v. Long*. ... [I]n all three cases, the Court applied the same balancing test to different factual situations." *Hernandez*, 941 F.2d at 136. This Court must therefore turn to the balancing test invoked in these cases to guide its decision on the applicability of *Buie's* framework to the sweep of the closets incident to the second entry.

According to the Supreme Court, "there is 'no ready test for determining reasonableness other than by balancing the need to search ... against the invasion which the search ... entails.'" *Buie*, 494 U.S. at 332, 110 S.Ct. 1093 (quoting *Terry v. Ohio*, 392 U.S. 1, 21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968)) (omissions in original). The interests at stake here are essentially identical to those recognized in *Buie*. The officers have the same interest "in taking steps to assure themselves that the house ... is not harboring other persons who are dangerous and who could unexpectedly launch an attack," regardless of whether an arrest has taken place.[1] *Id.* at 333, 110 S.Ct. 1093. They face the same "disadvantage of being on [their] adversary's 'turf'" and the same danger of "[a]n ambush in a confined setting of unknown configuration." *Id.* The invasion occasioned by the protective search is also the same, assuming that it is similarly restricted in scope to the search described in *Buie*.

There is every reason to find that the balance struck in *Buie* should extend to protective searches that are conducted incident to the entry into a residence for the purpose of securing clothes for an insufficiently dressed arrestee. Indeed, it arguably "would make no sense to hold that the police may conduct a protective sweep when lawfully entering with a warrant but must refrain from doing so when lawfully entering" on another basis. *United States v. Martins*, 413 F.3d 139, 149–50 (1st Cir. 2005). A similar conclusion has been reached by several Courts of Appeals that have addressed the issue. *See id.* ("[P]olice who have lawfully entered a residence possess the same right to conduct a protective sweep whether an arrest warrant, a search warrant, or the existence of exigent circumstances prompts their entry."); *Gould*, 364 F.3d at 584 (holding that "arrest is not always, or *per se*, an indispensable element of an in-home protective sweep"); *United States v. Taylor*, 248 F.3d 506, 513 (6th Cir.2001) (holding that, because officers could lawfully secure an area entered by consent while awaiting a search warrant, "it follows logically that ... the police may conduct a limited protective sweep to ensure the safety of those officers"); *United States v. Garcia*, 997 F.2d 1273, 1282 (9th Cir.1993) (upholding protective search following consented entry); *United States v. Patrick*, 959 F.2d 991,

---

1. Although the search for clothes is considered a separate entry into the arrestee's residence and must therefore be independently justified, in this case an arrest had just taken place.

996–97 (D.C.Cir.1992) (same); *see also United States v. Murphy,* 16 F.Supp.2d 397, 400 (S.D.N.Y.1998)("The finding that [the arrestee] answered the door in a state of undress and sought to return to the apartment for his clothes fully justified the officers in accompanying him into the premises and in conducting a protective sweep."). *But see United States v. Medina,* 301 F.Supp.2d 322, 333 (S.D.N.Y.2004) (explaining that protective sweep had not been unduly delayed because officers "could not do a protecting sweep until after the arrest"); *United States v. Santos,* 303 F.Supp.2d 333, 348 (S.D.N.Y.2003) (noting that "the protective sweep doctrine is limited in two ways—the sweep must be incident to a lawful arrest and confined to areas where a person could hide or that are within a suspect's 'grab area' ").

When the entry into a section of a home is lawful, it is entirely reasonable for officers to confirm through a limited protective inspection of the immediate vicinity that they are not at physical risk. Prudence, common sense, and the realities of law enforcement work support such a conclusion. A limited protective sweep comports with Fourth Amendment principles that the standard is workable for "rank and file, trained police officers," *Andreas,* 463 U.S. at 772, 103 S.Ct. 3319, that a resident's legitimate expectation of privacy in immediately adjoining areas is significantly diminished once officers can lawfully enter into a room, and that the standard

be an objective one that is "not dependent on the belief of individual police officers." *Id.* at 773, 103 S.Ct. 3319.

Finally, because the interests at stake are the same, the contours of the balance struck between them must also be the same here as in *Buie.* Arresting officers are not granted any more leeway to invade the privacy unnecessarily of an insufficiently dressed arrestee than they have with the fully dressed. To paraphrase Judge Learned Hand, it would be "small consolation to know that one's papers are safe only so long as one is [fully dressed] at home." *United States v. Kirschenblatt,* 16 F.2d 202, 203 (2d Cir.1926). The limits on protective sweeps outlined in *Buie* must therefore apply to an entry for the purpose of securing clothing. Specifically, the sweep must be limited to "a cursory inspection of those spaces where a person may be found" and must be supported by specific, articulable facts if it is to exceed the area "from which an attack could be immediately launched." *Buie,* 494 U.S. at 335, 334, 110 S.Ct. 1093.

▮ Extending the *Buie* framework to the agents' entry into the Rudaj bedroom, the agents sent upstairs "could, as a precautionary matter and without probable cause or reasonable suspicion, look in closets and other spaces immediately adjoining" the area in which they were lawfully permitted to enter in the fulfillment of a duty to obtain clothing for an arrestee.[2]

---

**2.** The availability of this type of search to the arresting officers is not precluded by the Second Circuit's opinions in *United States v. Gandia,* 424 F.3d 255 (2d Cir.2005), and *Moran Vargas,* 376 F.3d 112. In both cases, the Court of Appeals held unconstitutional protective sweeps of rooms immediately adjoining the location of non-custodial questioning for lack of specific, articulable facts to justify each search. Also common to the cases was the fact that the initial entry by the police was

made pursuant to the consent of the inhabitant.

In *Gandia,* the Court of Appeals made clear that it was applying this heightened standard, limited in *Buie* to more far-reaching protective sweeps, out of "concern" that a more straightforward application of *Buie* would "encourage officers to obtain ... consent as a pretext for conducting a warrantless search of the home." *Id.* at 262. The Second Circuit was not confronted in either case with the situation facing the agents here, where law

*Id.* at 334, 110 S.Ct. 1093. Once they opened the closet door as part of this precautionary search, the barrel of a gun protruding above the upper shelf fell into their plain view. Having identified the barrel as part of a weapon, the agents were entitled to approach the back of the closet and seize the weapon. While there, the agents could also seize the other patently incriminating evidence that fell into their plain view, including the other gun, the gun case, the knives, ammunition, and gun-cleaning supplies. All of the evidence seized from the master closet is therefore admissible.[3]

■ A different conclusion must be reached with respect to the evidence seized from the second, smaller closet. Entry into this closet for the purpose of a limited security check was proper, and the agents could likewise have seized any "[p]latently incriminating" evidence discovered in their plain view while looking for dangerous persons. *Kiyuyung*, 171 F.3d at 83. The white plastic bag and plain cardboard box that the agents removed from this closet were not, however, patently incriminating. In contrast to the white plastic bags properly removed from the master closet, the bag in the smaller closet did not reveal any incriminating contents through the transparent plastic.

The Government argues that the bag and box were sufficiently incriminating to justify seizure under the plain-view exception because they were found next to camouflage clothes in his wife's closet and because the bag resembled other white plastic bags found in the master closet. These two facts do not suffice to make the incriminating character of the bag or its contents "immediately apparent" without a further search. *Minnesota v. Dickerson,* 508 U.S. at 375, 113 S.Ct. 2130.

The Government further argues that the Fourth Amendment permits the warrant-

enforcement officials executing an arrest were under a legal duty that required warrantless entry to a restricted portion of a private residence. *See Di Stefano*, 555 F.2d at 1101 (noting that agents could fulfill duty alone or by accompanying arrestee to get clothing). Indeed, the court in *Gandia* stressed that "there was no need for the police officers to enter Gandia's home in the first place." *Id.* The questioning in both cases could just as easily have been carried out in a common area of the building.

Nor does *Kiyuyung*, 171 F.3d 78, compel a contrary conclusion. In that case, the Court of Appeals suppressed a gun found in a closet because the Government did not sustain its burden of establishing that the closet doors were open, and the gun consequently in plain view, when the officers performed their security sweep of an arrestee's apartment. *See id.* The court's opinion reflects the Government's argument that the closet was already open, and did not address the question of whether the arresting officers could have opened the closet as part of their search. The court did, though, state that the officers were "entitled to make a quick and limited 'security check'

of the premises to be sure that there are no persons or objects on the premises to pose a safety threat to the officers." *Id.* at 83. The ability to execute this type of check implies the ability to open a closet where a dangerous person might be hiding.

3. While seizing evidence in the corner of the closet, the agents also lifted a closed shoe box from the top shelf of the closet and opened it. The Government announced at the suppression hearing that it would not introduce evidence discovered in the shoe box. Nor could it. In their search of the box, the agents disregarded the Supreme Court's admonition in *Buie* that a protective sweep is "not a full search of the premises, but may extend only to a cursory inspection of those spaces where a person may be found." 494 U.S. at 335, 110 S.Ct. 1093. The excessive scope of the sweep lends some support to Rudaj's assertion that the agents intended from the beginning to conduct a thorough search of the premises. Nevertheless, a security sweep of the closets was objectively reasonable under the circumstances, and evidence discovered in plain view during the properly executed portions of this sweep is admissible.

less search of containers believed to contain incriminating evidence. This is not the law. "[T]he Fourth Amendment provides protection to the owner of every container that conceals its contents from plain view," *United States v. Ross,* 456 U.S. 798, 822–23, 102 S.Ct. 2157, 72 L.Ed.2d 572 (1982), unless specific and limited conditions obtain that would diminish that protection. *See, e.g., California v. Acevedo,* 500 U.S. 565, 574, 111 S.Ct. 1982, 114 L.Ed.2d 619 (1991) (container in automobile); *Andreas,* 463 U.S. at 773, 103 S.Ct. 3319 (1983) (container previously searched by government); *United States v. Place,* 462 U.S. 696, 701, 103 S.Ct. 2637, 77 L.Ed.2d 110 (1983) (exigent circumstances justifying seizure); *Arkansas v. Sanders,* 442 U.S. 753, 764 n. 13, 99 S.Ct. 2586, 61 L.Ed.2d 235 (1979) (distinctive, single-purpose container). In the absence of such conditions, however, the propriety of a warrantless search under the plain-view doctrine depends solely on the visibility of the contents, not of the container itself. For it is in the contents that the expectation of privacy lies. *See United States v. Chadwick,* 433 U.S. 1, 13 n. 8, 97 S.Ct. 2476, 53 L.Ed.2d 538 (1977).

Thus, the plain-view exception to the warrant requirement justifies the search of a closed container only if it "sp[eaks] volumes as to its contents," *Barrios–Moriera,* 872 F.2d at 17 (citation omitted), which is to say, only if the contents themselves are essentially in plain view. Both of the cases relied upon by the Government reflect this limitation. *See United States v. Grubczak,* 793 F.2d 458, 461 (2d Cir.1986) (noting that the agent "had *concluded* that the case [searched] contained lock-picking tools *before* he picked it up"); *United States v. Ocampo,* 650 F.2d 421, 427 (2d Cir.1981) (noting that the container was "unsealed," allowing the agent to see "currency sticking out of it"). Here, however, the plastic bag in the small closet revealed nothing about its contents to the agents. *Cf. United States v. Martin,* 157 F.3d 46, 55 (2d Cir.1998) (expressing skepticism that the plain-view doctrine would apply where police knew of a package's incriminating contents from a third party but had not seen the contents themselves).

Without a warrant, the agents were not justified in removing the bag for a closer inspection. The same is necessarily true with respect to the box, whose contents were revealed only after it was removed from the closet and the plastic bag was lifted off of it. *See Dickerson,* 508 U.S. at 379, 113 S.Ct. 2130 (explaining that seizure "could not be justified by the plain-view doctrine" where probable cause as to the item's incriminating nature arises "only as a result of a further search—the moving of the [item seized]—that was not authorized by a search warrant or by any exception to the warrant requirement").

Because the plastic bag was not subject to seizure under the plain-view doctrine, the agents were not entitled to remove it from the closet to inspect it more closely. Since the holsters, taser, and handcuffs were not visible to the agents when they opened the smaller closet as part of a "cursory" security check for hidden dangerous persons, this evidence must be suppressed.

*Conclusion*

The agents were entitled to enter Rudaj's bedroom in order to find clothing for him to wear. The two guns on either side of the nightstand, as well as the money and keys scattered across the top of the dresser, were in plain view to those agents, and were properly seized. The closets were lawfully entered as part of a protective sweep incident to the entry into Rudaj's bedroom for the purpose of procuring clothing. The incriminating evidence

found in the master closet was in plain view of the agents lawfully in the closet and was also properly seized. The box and bag removed from the smaller closet, in contrast, were not patently incriminating and should not have been disturbed without a warrant. The contents of the box must therefore be suppressed.

SO ORDERED: